In the

# United States Court of Appeals

## For the Seventh Circuit

No. 22-1303

STEVEN R. SMITH,

*Plaintiff-Appellant,*

*v.*

CROUNSE CORPORATION,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Southern District of Indiana, New Albany Division.
No. 4:20-cv-00090-TWP-DML — **Tanya Walton Pratt**, *Chief Judge.*

ARGUED SEPTEMBER 23, 2022 — DECIDED JULY 6, 2023

Before RIPPLE, ROVNER, and BRENNAN, *Circuit Judges.*

ROVNER, *Circuit Judge.* Steven R. Smith sued Crounse Corporation for injuries he sustained while unloading coal from a barge owned by Crounse. The district court granted summary judgment in favor of Crounse, and we affirm.

## I.

Smith worked for Mulzer Crushed Stone ("Mulzer") as a Bobcat skid steer operator. Crounse had a contract with

Mulzer to provide barges for Mulzer to transport its crushed stone product. Crounse would deliver the barges to Mulzer, which would then clean the barges to its satisfaction, load the barges with Mulzer's crushed stone, deliver the stone product, clean the barges again to a "broom swept" state, and then release the barges back to Crounse. Crounse's barges were used by other companies to haul other materials, including coal. Barges carrying coal were sometimes released back to Crounse with as much as a foot of coal remaining in the bottom of the hopper. Mulzer and Crounse agreed that Mulzer would clear any remaining coal from the barges and sell it for Mulzer's own profit. This relieved Crounse of the duty of cleaning the barges before delivering them to Mulzer and benefited Mulzer with the sale of the reclaimed coal.

On April 24, 2017, Smith was tasked with clearing out the last foot of coal from Crounse barge #128 so that it could be loaded with Mulzer's crushed stone. To accomplish this task, Smith was operating a skid steer with a "blade" attached and positioned at its lowest height. Smith planned to use the blade to push coal from the back of the hopper to the front for removal, and then complete the job by removing any remaining coal with a push broom. While operating his skid steer at approximately five to eight miles per hour, the blade ran into an obstruction on the steel floor of the hopper. The skid steer came to an abrupt stop, propelling Smith forward. Smith's seatbelt failed and he was injured when he hit a safety bar on the skid steer.

The obstruction on the hopper floor turned out to be a "scab." The floor of the hopper is composed of strips of steel that are welded together at the seams. As a barge ages, the seams are subjected to various forces during loading and

unloading and sometimes split. At times, a piece of equipment catches the edge of a split seam and bends part of the steel strip upward, forming a scab. In this instance, Smith's skid steer ran into a scab approximately twelve to fourteen inches long, and a few inches tall. R. 34-9. The barge at issue was twenty-four years old.

Smith had been operating the skid steer for Mulzer for approximately ten months when the accident occurred. Although he had driven Bobcat skid steers in the past at other jobs, Mulzer employees Jonathon Mulzer and Jason Otterbach provided additional training to Smith in the use of the skid steer. Smith had never encountered a scab when cleaning a barge with a skid steer, but he learned after the accident that Jonathon Mulzer and Jason Otterbach had encountered this type of defect in barges before. They had discovered the defects that same way that Smith had: by driving a skid steer into a raised portion of hopper flooring. After the accident, Smith and his co-workers pushed the coal away from the area and saw the scab that had caused the skid steer to stop abruptly. Smith observed marks on the scab that he believed to have been caused by a sledgehammer. He averred that all of the damaged area appeared rusty and that there were no breaks or tears in the metal that looked "fresh." He opined that the hammer marks and the rust meant that the damage was old, and that the defect had been hammered down but not welded into place at some point in the past. After Smith's accident, other Mulzer employees hammered down the scab, and the coal was then cleared from the barge. A Mulzer employee then sent an email to Crounse's Traffic Department informing Crounse that there was "about a 12" to 14" scab sticking up in the middle of the floor … that will need [to be] addressed sometime." According to the email, Mulzer

employees "bent it back down the best we could and will be able to load the barge. Might want to get it on a maintenance list sometime." R. 34-8. Mulzer did not inform Crounse that an employee had been injured as a result of running into the scab.

Crounse had procedures for regularly inspecting and repairing its barges. Every time a deckhand or engineer walked across barges that they were picking up or dropping off, they were directed to look for any damage that required repair. This inspection included any damage observed inside the hopper, on the hull of the barge, the winches, the deck fittings or any other areas of the barge. They also checked the barges for water leaks. If they found no damage, they made no report. If they found damage, they filed a damaged barge report. Crounse did not require employees to go into hoppers filled with a foot of coal dust to search for problems under the coal because it would not be safe to do so. Nevertheless, it was possible to detect split seams even in a barge loaded with coal. Employees inspecting barges were trained to look for water in the hull of the barge. Any water found would be pumped out, and an employee would then crawl the hull to determine where the water came from. This allowed Crounse to detect split seams from below the hopper where cargo was stored. Split seams are common on barges more than fifteen or twenty years old. Crounse asserted that damage that required immediate attention was always fixed at the first opportunity. That would include a floor scab that was protruding enough for equipment to become caught on it, or that was so extensive that it would cause rock or stone to leak down into the hull. Approximately eighty percent of damage was reported by Crounse employees conducting routine inspections, and

twenty percent was reported by third parties such as loading facilities.

Crounse did not consider the scab reported by Mulzer to be serious because the Mulzer email reporting it did not indicate that it was an urgent problem and did not reveal that anyone had been hurt as a result of this defect. Although split seams and scabs are common in barges of this age, Crounse's barge manager had never heard of anyone being injured by a split seam or scab in the eleven years he had been a barge manager. In the time period leading up to Smith's accident, Crounse had received no reports of damage to this barge, and the barge had last required repairs in December 2015. Nevertheless, after receiving the report from Mulzer, Crounse sent the barge for repairs in June 2017, and this seam, among others, was repaired within a few months of Smith's accident. Twenty-three days before Smith's accident, the barge had been cleaned by a blade without incident. The barge was also blade cleaned without incident only a few days before the June repairs were made. After Smith's accident and before the repairs were completed in June, the barge was used without any reported problems.

Nearly three years after the accident, Smith filed suit against Crounse for the injuries he sustained when his skid steer collided with the scab. He asserted claims for violations of section 905(b) of the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901, *et seq.*; general maritime law; and Indiana law. Following the completion of discovery, Crounse moved for summary judgment contending that: (1) there was no evidence that Crounse knew of or should have known of the scab defect at the time of the accident; (2) even if it had known of the defect, all parties were equally

aware that such a hazard could occur, and Mulzer determined how it would go about the contractual task of cleaning the barge; and (3) Smith admitted that the seatbelt, the safety crossbar and the speed of the skid steer caused his injuries, all factors not within Crounse's turnover duties. The district court concluded that Smith lacked evidence that Crounse had actual knowledge of the defect or that it should have known of the defect in the exercise of ordinary care, and thus Smith failed to demonstrate that Crounse failed to comply with its turnover duties under *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156 (1981). The court therefore granted summary judgment in favor of Crounse. Smith appeals.

## II.

On appeal, Smith contends that the district court analyzed the duty owed by the vessel owner to longshoremen employees of a stevedore under the wrong standard. He also argues that the court improperly excluded the opinion testimony of a lay witness and failed to construe the facts in a light most favorable to the non-moving party. We review the district court's grant of summary judgment *de novo*, and we examine the record in the light most favorable to the party opposing judgment, in this case Smith, construing all reasonable inferences from the evidence in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Horne v. Electric Eel Mfg. Co.*, 987 F.3d 704, 713 (7th Cir. 2021). Summary judgment is appropriate when there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson*, 477 U.S. at 247–48; *Horne*, 987 F.3d at 713.

The Supreme Court explained the duties owed by vessel owners to longshoremen employees of stevedores under

section 905(b) in two seminal cases: *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156 (1981); and *Howlett v. Birkdale Shipping Co.*, 512 U.S. 92 (1994). In *Scindia Steam*, the Court set out the general rule for liability of vessel owners under section 905(b):

> [T]he vessel owes to the stevedore and his longshoremen employees the duty of exercising due care "under the circumstances." This duty extends at least to exercising ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property, and to warning the stevedore of any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it in the exercise of reasonable care, that would likely be encountered by the stevedore in the course of his cargo operations and that are not known by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work.… The shipowner thus has a duty with respect to the condition of the ship's gear, equipment, tools, and work space to be used in the stevedoring operations; and if he fails at least to warn the stevedore of hidden danger which would have been known to him in the exercise of reasonable care, he has breached his duty and is liable if his negligence causes injury to a longshoreman.… It is also accepted that the vessel

> may be liable if it actively involves itself in the
> cargo operations and negligently injures a long-
> shoreman or if it fails to exercise due care to
> avoid exposing longshoremen to harm from
> hazards they may encounter in areas, or from
> equipment, under the active control of the ves-
> sel during the stevedoring operation.

*Scindia Steam*, 451 U.S. at 166–67 (internal citation omitted).

The specific issue raised in *Scindia Steam* was the vessel's duty to longshoremen once cargo operations have begun. The Court noted that vessel owners are, to a certain extent, entitled to rely on stevedores to protect their longshoremen employees during cargo operations:

> We are of the view that absent contract provi-
> sion, positive law, or custom to the contrary—
> none of which has been cited to us in this case—
> the shipowner has no general duty by way of
> supervision or inspection to exercise reasonable
> care to discover dangerous conditions that de-
> velop within the confines of the cargo opera-
> tions that are assigned to the stevedore. The nec-
> essary consequence is that the shipowner is not
> liable to the longshoremen for injuries caused
> by dangers unknown to the owner and about
> which he had no duty to inform himself. This
> conclusion is plainly consistent with the con-
> gressional intent to foreclose the faultless liabil-
> ity of the shipowner based on a theory of unsea-
> worthiness or nondelegable duty. The ship-
> owner, within limits, *is* entitled to rely on the
> stevedore,    and    owes    no    duty    to    the

> longshoremen to inspect or supervise the cargo operations.

*Scindia Steam*, 451 U.S. at 172.

The situation presented in *Scindia Steam* forced the Court to consider the limits of the vessel owner's reliance on the stevedore to keep its longshoremen employees safe. In that case, the ship's winch was malfunctioning, but the stevedore improvidently directed its longshoremen to continue using it. The Court concluded that, if the vessel owner knew of the defect in the winch and should have realized that the winch presented an unreasonable risk of harm to the longshoremen, then in some circumstances, the vessel owner would have a duty to intervene and repair the ship's winch. *Scindia Steam*, 451 U.S. at 175–76. This would be true, for example, if the vessel owner knew that the defect existed from the outset. The Court also noted that any contract between the stevedore and the vessel owner should also be considered if any provisions had bearing on the suit.

In *Howlett*, the Court addressed a vessel's turnover duty to warn of latent defects in the cargo stow and cargo area. *Howlett* involved a longshoreman who was injured when unloading cargo from the defendant's vessel. The cargo, which consisted of bags of cocoa beans, had been improperly placed on plastic sheets by the stevedore that loaded the bags. The vessel had supplied the plastic sheets to the loading stevedore. The plaintiff could not see the sheets, which were covered with dirt and debris, and he slipped and fell on a sheet, seriously injuring himself. The Court considered the scope of the vessel owner's duty to warn of latent hazards in the cargo stow, an analysis that depended in part on the vessel owner's duty to inspect for such defects. 512 U.S. at 94–96.

The *Howlett* Court summarized the three general duties that shipowners owe to longshoremen:

> The first, which courts have come to call the "turnover duty," relates to the condition of the ship upon the commencement of stevedoring operations.… The second duty, applicable once stevedoring operations have begun, provides that a shipowner must exercise reasonable care to prevent injuries to longshoremen in areas that remain under the "active control of the vessel." The third duty, called the "duty to intervene," concerns the vessel's obligations with regard to cargo operations in areas under the principal control of the independent stevedore.

*Howlett*, 512 U.S. at 98 (quoting *Scindia Steam*, 451 U.S. at 167–178) (internal citations omitted).

The turnover duty is at issue in Smith's appeal. The *Howlett* Court described that duty:

> A vessel must "exercise ordinary care under the circumstances" to turn over the ship and its equipment and appliances "in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter, arising from the hazards of the ship's service or otherwise, will be able by the exercise of ordinary care" to carry on cargo operations "with reasonable safety to persons and property." … A corollary to the turnover duty requires the vessel to warn the stevedore "of any hazards on the ship or with

respect to its equipment," so long as the hazards "are known to the vessel or should be known to it in the exercise of reasonable care," and "would likely be encountered by the stevedore in the course of his cargo operations[,] are not known by the stevedore[,] and would not be obvious to or anticipated by him if reasonably competent in the performance of his work."

*Howlett*, 512 U.S. at 98–99 (internal citations omitted). Howlett confined his claim to an allegation that the vessel owner failed to warn that the deck was covered with plastic rather than the paper and plywood that were ordinarily used when loading cocoa beans.

The Court concluded:

[T]he vessel's turnover duty to warn of latent defects in the cargo stow and cargo area is a narrow one. The duty attaches only to latent hazards, defined as hazards that are not known to the stevedore and that would be neither obvious to nor anticipated by a skilled stevedore in the competent performance of its work. *Scindia Steam*, 451 U.S., at 167, 101 S.Ct., at 1622. Furthermore, the duty encompasses only those hazards that "are known to the vessel or should be known to it in the exercise of reasonable care." *Ibid.* Contrary to Howlett's submission, however, the exercise of reasonable care does not require the shipowner to supervise the ongoing operations of the loading stevedore (or other

>      stevedores who handle the cargo before its arri-
>      val in port) or to inspect the completed stow.

*Howlett*, 512 U.S. at 105.

With these standards in mind, we turn to the circumstances of Smith's injury. As Smith has pointed out, he was injured by a defect in the vessel, not a defect in the cargo stow. Nevertheless, that vessel defect was in the cargo area and was hidden by cargo (the remaining coal) that had been left behind by the last stevedore; in fact, Smith's employer was contractually obligated to remove that remaining cargo and clean the floor of the hopper. Smith has presented no evidence suggesting that Crounse had actual knowledge about the scab defect before the accident. Consequently, Crounse did not warn Mulzer or any of its employees about the scab. There is no dispute that Crounse charged its employees with regularly inspecting the barges and promptly reporting any problems. Crounse's corporate representatives testified that the company repaired serious problems as soon as it became aware of them. That included promptly fixing any scab that was protruding enough for equipment to become caught on it. Crounse's inspections did not include requiring employees to go down into the remaining foot of coal/cargo and search for problems; such an inspection would require climbing in and out of the barge while it was moving up and down the river, a procedure that was not safe. Crounse also trained workers to check the hull for water leaks that could indicate split seam damage to the floor of the hopper.

Smith presented no evidence on industry standards for inspection of vessels and so the record contains no evidence that Crounse's inspection and repair procedures were inadequate, neglectful or failed to meet industry standards. Nor is there a

history of problems with Crounse's inspection procedures in the record. Although Smith had never encountered a defect of this type, there is no dispute that the two employees at Mulzer who trained Smith were aware that barges of this age could have split seams and scabs on the floor of the hopper. In fact, they had encountered defects of this sort in the past in the same manner that Smith did, by hitting them with a skid steer blade. Those encounters had not caused injuries, and the only Crounse employee to testify on the matter was not aware of any injuries caused by scabs in the eleven years that he had been employed there. The Mulzer trainers apparently had not passed on their knowledge of these types of defects to Smith.

Nevertheless, Smith contends that Crounse should have known of the defect or that the company had constructive knowledge of the scab and should have warned Mulzer. Specifically, Smith averred that the "scab appeared to be old damage. It did not have any tears or breaks in the metal that were fresh. All damage was rusty. The scab also had marks of prior repairs that showed it had been hammered down in the past, but had not been welded in place." R. 35-1. The district court ruled that, as a lay witness, Smith would be allowed to testify to his observations regarding the presence of rust or the appearance of marks on the scab. But the court would not admit Smith's opinions on whether the tears or breaks were "fresh" or "old damage," how long the rust had been present, or whether the scab had previously been repaired by being hammered down but not welded. We review the district court's decision to admit or exclude lay opinion for abuse of discretion. *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 547 (7th Cir. 2011).

The court appropriately credited Smith's averments that rust was present and that he observed marks on the metal. But the court was well within its discretion in excluding Smith's lay opinion on the implications of these observations, such as whether the damage was old or fresh based on the rust and the marks on the metal, how the marks were created, or whether the scab had previously been hammered but not welded. The presence of corrosion or other marks on the metal and the inferences to be drawn from them are matters for expert rather than lay testimony, or so the district court could have reasonably concluded. A calculation of how fast corrosion would appear would likely depend on myriad factors that are the subject of expert rather than lay opinion. Federal Rule of Evidence 701 governs the admission of a lay witness's opinion testimony, which must be (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge. *United States v. Eaden*, 37 F.4th 1307, 1312 (7th Cir. 2022). The district court reasonably found that the implications of rust or certain marks on the metal required scientific, technical or specialized knowledge, requiring expert testimony. We see no abuse of discretion in that decision.

Smith had no personal knowledge of when the scab was created, how the marks that he observed were created, or whether Crounse or a third party had previously tried to repair the area with hammering or welding. He offered nothing other than speculation to support his opinion testimony. As is apparent from the actions of Mulzer employees on the day of Smith's accident, it is possible that a prior stevedore created the scab and then hammered it down in order to complete the job, without Crounse's knowledge. Indeed, immediately

before Crounse delivered the barge to Mulzer, another stevedore had loaded and then partially unloaded coal from the hopper and could have created the scab during that process. It is even possible that Smith created the scab when his skid steer blade hit a split seam. On this record, a jury would have to speculate about when the scab was created and whether Crounse would have had an opportunity to detect it before delivering the barge to Mulzer for cleaning.

Smith contends that the district court improperly weighed his credibility when it found his testimony "unpersuasive." It is clear from context, though, that the court was not weighing the evidence or deciding Smith's credibility but rather was excluding the opinion evidence because it was a matter for expert rather than lay testimony. No other evidence supported Smith's claim that the damage was old or existed at the outset, a point Smith sought to make to prove that Crounse should have known the defect was present when the vessel was turned over to Mulzer.

Smith also failed to produce evidence suggesting that Crounse should have known about the scab in the exercise of reasonable care. In fact, the evidence showed that Crounse's employees regularly inspected the barges, that no Crounse employee or third party had reported this defect, that the barge at issue had been cleaned with a blade by a skid steer without incident approximately three weeks before Smith's accident, and that the barge was used without incident for a few months after Smith's accident and before the seam in question was professionally repaired. Crounse's corporate representative testified that split seams were common on barges of this age and that persons operating skid steers in this environment would have known to proceed with caution.

Crounse was also unaware of any instance of a scab causing an injury, and Mulzer's own employees treated the issue as relatively minor, telling Crounse that it "[m]ight want to get it on a maintenance list sometime." Smith's own testimony that other Mulzer employees had encountered scabs in similar situations supports Crounse's claim that the problem was one likely to be encountered by a stevedore in the course of cargo operations, and anticipated by him if reasonably competent in the performance of his work. There is no evidence in the record to the contrary. Under *Howlett* and *Scindia Steam*, the court therefore correctly concluded that Smith lacked evidence to hold Crounse liable for Smith's injuries under section 905(b).

Smith's remaining arguments to the contrary are unavailing. Smith asserts that the district court applied the standard for the vessel owner's duty regarding defects in the cargo stow rather than defects in the vessel itself. The court made no such error. The court ruled against Smith because he failed to provide evidence that Crounse knew of the defect or should have known of the defect in the exercise of ordinary care, the standard set forth for a vessel owner's turnover duty in *Scindia Steam* and *Howlett*. *See Scindia Steam*, 451 U.S. at 167 ("The shipowner thus has a duty with respect to the condition of the ship's gear, equipment, tools, and work space to be used in the stevedoring operations; and if he fails at least to warn the stevedore of hidden danger *which would have been known to him in the exercise of reasonable care*, he has breached his duty and is liable if his negligence causes injury to a longshoreman.") (emphasis added); *Howlett*, 512 U.S. at 98–99 (same). As we just noted, Smith produced no evidence that Crounse's inspection and maintenance routines were

inadequate. The mere existence of the scab is not evidence that Crounse's procedures were neglectful.

Smith also argues that it was not merely his personal opinion that Crounse's inspections were inadequate but that the Supreme Court had decreed that the vessel's owner had a duty to inspect areas of the ship commensurate with its access and control. Again, although it is true that the Court stated that, between ports, the vessel's owner has a duty to inspect areas within its access and control, all of the evidence suggests that Crounse did so in a reasonable manner. The area under the remaining coal was not safely accessible while the vessel was in transit, and there is no evidence that Crounse could have discovered the scab before Smith's accident in the exercise of reasonable care. In addition to its frequent visual inspections, Crounse employees also regularly checked for water leaks that might indicate the presence of split seams, and there is no evidence in the record that Crounse failed to abide by this procedure or that this procedure did not meet the standard of reasonable care. Smith produced no evidence regarding industry standards, for example, to call into question the adequacy of Crounse's procedures in this situation. Summary judgment was therefore appropriate.

None of the cases relied upon by Smith alter this outcome. Smith cites *Matthews v. Ernst Russ S.S. Co.*, 603 F.2d 676 (7th Cir. 1979), as controlling the outcome here because the court there did not "agonize over what precisely the defendant therein knew and when the defendant knew it." Smith reads *Matthews* as holding that the vessel was implicitly charged with constructive knowledge of the flaws of a ladder where the vessel had allowed a state of disrepair arising from normal wear and tear over a period of time. But there is no holding

on constructive knowledge in *Matthews*. In that case, the vessel owner attempted to argue that it could not be held liable for the stevedore's use of a badly broken ladder because the dangers of using it were open and obvious. The court noted only that the jury was presented with sufficient evidence of the vessel owner's negligence without detailing that evidence. Smith reads too much into *Matthews*.

Nor is Smith aided by our analysis in *Cameron v. Consolidated Grain & Barge Co.*, 654 F.2d 468 (7th Cir. 1981). In *Cameron*, we reversed a jury verdict against a vessel owner and in favor of a longshoreman injured by a protrusion on the vessel because there was no evidence that the vessel owner had actual or constructive knowledge of the existence of the protrusion. Instead, the vessel owner produced evidence that, consistent with industry practice, it assigned the duty of inspecting the barges to barge cleaners and tugboat operators. The plaintiff's own expert testified that this practice was safe and reasonable so long as the inspectors were competent. The plaintiff produced no evidence that the inspectors were not competent. We noted that the record contained no evidence that the vessel owner should have known about the protrusion prior to the accident that injured the longshoreman:

> This is not a case in which the jury was compelled to choose between two conflicting bodies of proof. Rather, the jury was confronted with [plaintiff's] unsupported assertions, on the one hand, and [the vessel owner's] proof to the contrary, on the other. [The vessel owner] proved that [the barge] was inspected in a reasonable and safe manner consistent with industry standards only three days prior to the accident and

that the inspection did not reveal the protrusion which caused [the plaintiff's] injury. [The plaintiff] offered no proof that the inspection was improper. [The vessel owner] also showed that the protrusion was not "wear and tear" but could have been caused by a single incident prior to [the plaintiff's] accident. ... He offered only his own testimony to show that the protrusion did not occur after the barge's arrival at Illinois Grain and nothing to show that it did not occur during towing. Absent proof that the inspection was improper or negligent or that the protrusion did not occur during or after the inspection, there simply was no evidence to support a finding of actual or constructive notice. Here the evidence showed only that [the vessel owner] took all reasonable steps to ensure that [the barge] was safe when it arrived[.]

*Cameron*, 654 F.2d at 472–73.

According to Smith, we can infer from *Cameron*'s holding of insufficient evidence what evidence would be sufficient to show constructive knowledge, including failure of inspection, knowledge of the hazard generally, testimony that the hazard is caused by wear and tear rather than a single unpredictable event, exclusive control by the defendant rather than a third party just prior to the accident, and evidence that the hazard existed at the outset of the plaintiff's encounter with the barge. According to Smith, all of that evidence is present here. But as we have just noted, Crounse did produce evidence of reasonable inspection and repair procedures, and Smith produced no evidence that these procedures were inadequate.

Although split seams are caused by wear and tear, the record contains uncontested evidence that scabs are created by unpredictable events when a piece of equipment such as a skid steer catches an edge of a split seam at great enough speed. In this case, the barge was under the control of the prior stevedore until Crounse delivered it to Mulzer, without a safe opportunity to inspect the bottom of the hopper that was covered with coal that Mulzer was contractually obligated to remove. Nor was there any competent evidence regarding how long the defect had existed when the barge was delivered to Mulzer. *Cameron* thus supports Crounse rather than Smith.

We have considered Smith's other arguments and find none persuasive. In the end, Smith produced no evidence demonstrating that Crounse knew or, in the exercise of reasonable care, should have known of the defect in the hopper floor. The district court correctly entered judgment in favor of Crounse.

                                                    AFFIRMED.