In the

# United States Court of Appeals
## For the Seventh Circuit

No. 21-1730

BENJAMIN ADAMS,

*Plaintiff-Appellant,*

*v.*

CHRISTINA REAGLE, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Southern District of Indiana, Terre Haute Division.
No. 2:17-cv-00483-JPH-MJD — **James Patrick Hanlon**, *Judge.*

ARGUED NOVEMBER 28, 2022 — DECIDED JANUARY 30, 2024

Before ROVNER, ST. EVE, and KIRSCH, *Circuit Judges.*

ROVNER, *Circuit Judge.*[1] Benjamin Adams has sued the current and former commissioners of the Indiana Department of Corrections and various other officials at Indiana's Plainfield

---

[1] Judge Rovner's opinion represents the opinion of the court except as to Section II.B. That section constitutes Judge Rovner's dissent as to the due process claim. Judge St. Eve's separate concurrence, joined by Judge Kirsch, represents the majority opinion as to Adams' due process claim.

Correctional Facility pursuant to 42 U.S.C. § 1983, charging them with violating his First and Eighth Amendment rights, as well as his Fourteenth Amendment rights to due process and equal protection. On cross-motions for summary judgment, the district court resolved all of these claims in favor of the defendants. *Adams v. Peltier*, 2021 WL 1061223 (S.D. Ind. Mar. 19, 2021). For the reasons that follow, we affirm.

## I.

Benjamin Adams was sentenced by an Indiana court in 2004 to a prison term of 30 years for attempted murder and a consecutive term of four years for involuntary manslaughter. As of January 2017, Adams was housed at Plainfield.

On January 18, 2017, he was assigned to work in the prison kitchen, but that assignment was rescinded at the behest of Clinton Feldkamp, Plainfield's Director of Intelligence and Investigation, and Investigator Paul Prulhier out of concern that Adams might use the assignment to smuggle drugs into the prison—in December 2016, Adams had been found guilty on a disciplinary charge related to drug trafficking (the "drug-trafficking charge"). This prompted Adams to file an internal ombudsperson complaint against Feldkamp and Prulhier. That complaint was denied, and Adams was removed from the kitchen assignment.

On February 5, 2017, Plainfield inmate Kenneth Garretson engaged in a physical altercation which left another, unidentified inmate injured. Feldkamp investigated and interviewed Adams, Garretson, inmate Raymond Barnett (whom Feldkamp found was also involved in the assault), and several other confidential witnesses. Feldkamp concluded that Adams had ordered the assault because the victim had stopped

paying protection money to either Adams or the security threat group (a.k.a. gang) with which Adams purportedly was affiliated, the Vice Lords. Garretson, who had carried out the assault, was affiliated with another security threat group, the Almighty Gaylords, which was known to coordinate activities with the Vice Lords. Feldkamp also determined in the course of his investigation that one of the correctional officers, Officer Nelson, who was on duty at the time of the altercation and whom Feldkamp suspected of favoring and having improper relationships with one or more Black offenders, had failed to maintain appropriate control over Adams. Nelson ultimately left IDOC during this investigation. In the meantime, in the aftermath of the assault, Adams was assigned to disciplinary segregation on February 10.

Adams denies any responsibility for the assault. On February 18, 2017, Garretson sent an email to the ombudsperson averring that Adams had no knowledge of and did not participate in the assault.

On March 7, based on his investigative findings regarding the assault, Feldkamp charged Adams with offense A-100 for engaging in criminal gang activity. We will refer to this charged offense throughout our opinion as the "assault charge," the "assault offense," or the "assault conviction," although the particular label that IDOC attached to the offense changed over time. Disciplinary Hearing Officer J. Peltier found Adams guilty of that offense on March 16. Peltier did not allow live testimony at the hearing (and therefore denied Adams' witness requests),[2] denied Adams' request for video

---

[2] Adams had requested testimony from Garretson and Barnett, among other individuals.

surveillance evidence, and resolved the matter based on the written statements submitted, crediting Feldkamp's statement over Adams' own statement. Adams was ordered to spend one year in disciplinary segregation, 365 days of his earned good time credits were revoked, and he was demoted from credit-earning class 1 to class 3.

Separately, on February 23, Adams was charged with the unlawful possession of a cell phone (the "cell phone charge" or "cell phone offense"). On March 11, Peltier conducted a hearing on that charge and found Adams guilty. Peltier sanctioned Adams with one year in disciplinary segregation and the loss of 180 days of earned good time credits. He also recommended that Adams be transferred to a more secure facility.

On March 22, 2017, Plainfield counselor B. Newman, pursuant to a reclassification hearing, R. 202-1 at 3, determined that Adams should be reclassified to department-wide restrictive housing for having committed eight different conduct violations within one year, with the assault offense constituting one of those violations. (The other seven violations included multiple offenses involving the possession of a cell phone, wireless device, or electrical device; staff/offender provocation; and attempting to engage in drug trafficking.) The following reasons were cited for the reclassification: "poor adjustment," "disciplinary," "threat to facility security," "recent negative adjustment," and "departmental needs." R. 202-1 at 4. The decision was not attributable to any single incident but rather to the aggregation of multiple violations. R. 202-1 at 1 (declaration of Diane Pfeiffer ¶¶ 5–6). Pursuant to the reclassification, Adams was to remain in department-wide restrictive housing

for a period of two years. Department-wide restrictive housing is a form of long-term segregation which, we understand, follows an inmate from one correctional facility to the next. *See Crouch v. Brown*, 27 F.4th 1315, 1318 n.2 (7th Cir. 2022) (noting that restrictive housing may be operated either at a facility level or on a department-wide basis).

On June 30, 2017, Adams was transferred to the restricted housing unit at the Wabash Valley Correctional Facility. Wabash Valley has a Secured Housing Unit or Secured Control Unit to which inmates in department-wide administrative restrictive housing are assigned. This unit is considered a "supermax" section of the prison. *See Alkhalidi v. Buss*, 2015 WL 1268285, at *1 n.3 (S.D. Ind. Mar. 19, 2015). The record does not make clear whether this was the unit to which Adams was assigned. His declarations and deposition testimony make reference to being housed in the "SHU" or the "segregated housing unit." *E.g.*, R. 189 at 7 (declaration of Benjamin E. Adams ¶ 53); R. 217 at 42 (deposition of Benjamin E. Adams at 41).

Adams appealed the assault conviction up through the prison hierarchy unsuccessfully (officer C.A. Penfold denied his first-level appeal), but after he filed a habeas petition in federal court in which he argued that he had been denied the right to call witnesses at his disciplinary hearing and that he had been singled out for adverse treatment on the basis of his race in violation of his equal protection rights, the final prison review officer reconsidered his internal appeal, designated the matter for rehearing, and vacated all sanctions imposed, thereby mooting his habeas petition. *See Adams v. Sup't*, No. 1:17-cv-01534-WTL-TAB, R. 20 (Sep. 15, 2017) (dismissing case as moot).

On October 13, 2017, Feldkamp amended the charging document to charge Adams with offense A-111/102, conspiracy to commit assault and battery with serious bodily injury. (We will continue to use the moniker "assault" to describe this amended charge.) Adams again requested live witness testimony, including testimony from Garretson, Barnett, the injured inmate, and multiple prison officers. Barnett submitted a written statement on Adams' behalf averring that neither he nor Adams was involved in the assault. On October 20, Disciplinary Hearing Officer H. Andrews conducted the rehearing on the charge. Andrews did not allow testimony from any of the witnesses that Adams had requested, including Barnett; Andrews gave no explanation for why he did not allow Barnett to testify. Andrews convicted Adams of the assault charge. Essentially the same penalties were imposed as a result of the conviction on rehearing: Adams was deprived of 360 days of good time credits, he was demoted from credit-earning class 2 to class 3, and he was ordered to spend one year in disciplinary segregation. Adams again appealed the disciplinary conviction, and while that appeal was pending within the prison hierarchy—it would be unsuccessful—he again filed a petition for a writ of habeas corpus in federal court, arguing that his requests for live witness testimony and other evidence had been denied in violation of his right to due process.[3]

On February 26, 2018, the final prison reviewing authority reconsidered Adams' appeal as to the drug-trafficking charge dating back to 2016, designated that charge for rehearing, and

---

[3] Adams had been transferred to Wabash Valley by the time of the rehearing on the assault charge, and it was the warden at Wabash Valley, Richard Brown, who denied his final internal appeal from the rehearing.

vacated the sanctions that had been imposed on that charge. After that ruling, Adams agreed to plead guilty to a lesser charge and in return faced no additional time in disciplinary segregation on that charge.

Shortly thereafter, Adams was again reclassified, to department-wide administrative restrictive housing, based on the seven conduct violations of which he had been found guilty in the previous two years. (The drug-trafficking charge had been one of the eight violations cited for his previous reclassification to department-wide restrictive housing in March 2017.) Adams' involvement in an assault and battery that resulted in serious bodily injury to an inmate was cited as a reason for the reclassification. *See Adams v. Warden*, No. 2:18-cv-00294-JMS-MJD, R. 15-1 (exhibit submitted *ex parte* and confidentially).

In August 2018, the habeas court granted Adams' request for a writ of habeas corpus as to his conviction on the assault charge, concluding that the prison had deprived him of procedural due process. *Adams v. Sup't*, 2018 WL 4077022 (S.D. Ind. Aug. 27, 2018) (Magnus-Stinson, J.). Based on his disciplinary conviction for assault, Adams had *inter alia* lost 360 days of earned credit time, and the court noted that the loss of good-time credits required certain procedural protections, including the opportunity to present evidence to an impartial decisionmaker and the right to call witnesses. *Id.* at *1. The judge went on to conclude that the prison had wrongfully denied Adams the opportunity to present the live testimony of at least one witness, inmate Barnett, who would have testified that he and Adams had nothing to do with the attack on the victim. Although the hearing officer had considered Barnett's written statement, the officer had,

without any explanation, refused Adams' request for live testimony from Barnett. *Id.* at \*3. The judge noted that this court had previously rejected the contention that a witness's testimony at a prison disciplinary hearing is categorically unnecessary when the witness has submitted a written statement. *Id.* (citing, *inter alia*, *Whitlock v. Johnson*, 153 F.3d 380, 388 (7th Cir. 1998)). In this case, the prison had not met its burden of providing a justification for the denial of Barnett's requested testimony. *Id.* The judge thus concluded that Adams' due process rights had been violated. *Id.* She ordered that two of the three sanctions that had been imposed—the revocation of 360 days of good time credit and the demotion from credit-earning class 2 to class 3—be vacated. *Id.*

Adams was then charged for a third and final time in connection with the assault: on September 17, 2018, Feldkamp modified the charge to aiding/attempted/conspiracy to assault. After a hearing at which Adams was allowed to call some but not all of the witnesses he requested, *see* R. 217 at 87–88 (Deposition of Benjamin E. Adams at 86–87), Disciplinary Hearing Officer Carpenter found Adams guilty. (The record does not make clear which witnesses were allowed or denied, nor does it reveal what penalties were imposed upon Adams' conviction.) But on December 3, 2018, pursuant to Adams' internal administrative appeal, the warden dismissed the conduct report and expunged the sanctions on the ground that the allegations against Adams were too vague, thereby bringing the matter to a close.

In the meantime, Adams had also obtained relief on the cell phone charge, with the result that the revocation of his

good time credits and his one-year assignment to disciplinary segregation in that matter were also vacated.

By this time, however, Adams had already served 730 days (two years) in restrictive housing pursuant to his reclassification (in 2017, and again in 2018) to department-wide restrictive housing, which reclassification decision was based in part on his disciplinary conviction for the assault. Inmates placed in restrictive housing are confined to their cells for 23 hours a day, are not granted access to commissary or hygiene items, may not participate in religious services, have limited telephone rights, limited showering rights, limited human contact, and are given smaller portions of food (they are served an afternoon meal at 3 p.m. and are not fed again until breakfast the following day). Adams alleges that these harsh conditions negatively affected his health, both physically and mentally.

While he was challenging his assault conviction, Adams filed suit in the district court seeking declaratory, injunctive, and monetary relief. As amended and as relevant here, Adams alleged that the defendants (among them Feldkamp, the two disciplinary officers, Peltier and Andrews, who conducted the original hearing and the rehearing on the assault charge and adjudged him guilty, and Penfold, who among other things denied his first internal appeal of his assault conviction) violated his First Amendment right to free speech by wrongfully charging and convicting him in the assault case in retaliation for having complained about his rescinded kitchen assignment; deprived him of his Fourteenth Amendment due process rights by not allowing him to present live witnesses and other evidence at the first two disciplinary hearings on the assault charge; deprived him of his Fourteenth

Amendment right to equal protection of the law by punishing him more harshly for the assault based on his race; and violated his Eighth Amendment rights by subjecting him to the allegedly cruel and inhumane conditions of department-wide restrictive housing as a result of his wrongful disciplinary conviction. Adams was *pro se* in the district court.

On cross-motions for summary judgment, the district court (Hanlon, J.) granted summary judgment to the defendants. *Adams v. Peltier*, 2021 WL 1601223. As to the First Amendment retaliation claim, there was no dispute that Adams' ombudsperson complaint about Feldkamp having him removed from the kitchen assignment constituted protected speech, nor was there any dispute that spending a significant amount of time in restrictive housing would deter First Amendment activity. *Id.* at *6. But the court found the evidence wanting as to whether Adams' complaint was a motivating factor for the disciplinary action taken against Adams in the assault matter. *Id.* at *7. With respect to the due process claim, the court was not persuaded that Adams had been deprived of procedural due process when he was denied the opportunity to present live witnesses at his disciplinary hearings on the assault charge. The judge assumed, in view of the significant period of time Adams had spent in restrictive housing and the relatively harsh conditions he described, that Adams was deprived of a protected liberty interest by being assigned to that housing. *Id.* at *8. There was also a question of fact as to whether Adams' disciplinary conviction in the assault case contributed to the reclassification decision that placed him in department-wide restrictive housing. *Id.* at *4. But, relying on this court's opinion in *Westefer v. Neal*, 682 F.3d 679, 685 (7th Cir. 2012), which indicates that such placement decisions require only "informal due process" which

"leave[s] substantial discretion and flexibility in the hands of prison administrators," the court was satisfied that Adams had been given an "opportunity to present his views" and was not deprived of due process despite being denied the opportunity to present live witness testimony. *Id.* at *7. As to the equal protection claim of race discrimination, which was focused primarily on Feldkamp, the court determined that Adams had not presented evidence that another, similarly situated inmate of a different race was treated more favorably than he was vis-à-vis the assault. *Id.* at *5. Nor was the court convinced that evidence of Feldkamp's racially-conscious remarks and actions constituted direct evidence of a discriminatory animus on Feldkamp's part. *Id.* Finally, as to the Eighth Amendment claim, the court determined there was no evidence that Feldkamp or any of the other defendants had any control over the conditions Adams experienced in restrictive housing; consequently, they could not be held liable for any Eighth Amendment violation. *Id.* at *8.

## II.

We review the district court's summary judgment decision *de novo*, *e.g.*, *Gnutek v. Ill. Gaming Bd.*, 80 F.4th 820, 823–24 (7th Cir. 2023), resolving any factual disputes in Adams' favor and granting him the benefit of all reasonable inferences that may be drawn from the evidentiary record, *e.g.*, *Smith v. Crounse Corp.*, 72 F.4th 799, 804 (7th Cir. 2023). We agree with

the district court that the defendants were entitled to summary judgment on each of Adams' claims.[4]

A. *First Amendment claim.*

The First Amendment claim is premised on the notion that Feldkamp pursued the assault charge against Adams in retaliation for his complaint to the ombudsperson that Feldkamp had wrongfully blocked him from serving in the kitchen at Plainfield, and that the various hearing officers who subsequently ruled against Adams on the assault charge were influenced by Feldkamp to do so. To succeed on this claim, Adams must establish that (1) that he engaged in protected First Amendment activity; (2) that an adverse action was taken against him, and (3) that his protected conduct was at least a factor that motivated the adverse action. *Holleman v. Zatecky*, 951 F.3d 873, 878 (7th Cir. 2020) (citing *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009)). There is no dispute here as to the first two elements; our focus is on the third. We agree with the district court that the evidence is insufficient to suggest that Feldkamp was motivated by the ombudsperson complaint to pursue disciplinary action against Adams.[5]

As developed on appeal, there is more to Adams' case in this regard beyond the chronology of events. Recall that the

---

[4] Adams sought injunctive and declaratory relief below, but as he is no longer in the custody of IDOC, any such claims are moot. *Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003) (citing *Higgason v. Farley*, 83 F.3d 807, 811 (7th Cir. 1996)). Only monetary relief from the defendants in their individual capacities is available at this juncture.

[5] Below, Adams pursued failure-to-train theories of liability against then-IDOC Commissioner Robert Carter as to both his First Amendment retaliation claim and his equal protection claim. He does not pursue any such theory of liability as to Carter on appeal.

district court reasoned that the chronology alone was insufficient to suggest retaliation, given that more than two weeks passed between the complaint and Feldkamp's first report implicating Adams in the assault. But, granting Adams the benefit of an assumption that Feldkamp knew about the complaint, the additional evidence to which Adams points is not sufficient to support an inference that Feldkamp was motivated by a retaliatory animus to pursue the assault charge against him.

Adams points to a prior incident in which Feldkamp sent him to segregation in 2016 after he complained about a strip-search. But even if we indulge the assumption that Feldkamp's motive in that instance was retaliatory, Adams does not explain how that incident is relevant apart from a propensity inference that because Feldkamp had retaliated against Adams previously, it was likely that he did so again when Adams complained about being excluded from kitchen duty. *See* Fed. R. Evid. 404(b)(1); *United States v. Gomez*, 763 F.3d 845, 856 (7th Cir. 2014) (en banc); *Lange v. City of Oconto*, 28 F.4th 825, 843 (7th Cir. 2022); *see also*, *e.g.*, *Turley v. Todaro*, 682 F. App'x 502, 503–04 (7th Cir. 2017) (non-precedential decision) (plaintiff prisoner's theory that act of retaliation against another prisoner was relevant to show that defendants retaliated against plaintiff as well depended on impermissible propensity inference).

Beyond that, Adams essentially argues there is evidence that Feldkamp trumped up the assault charge against him. Certainly it is true that Adams has consistently denied the charge, and Adams asserts that inmates Barnett and Garretson have both represented that Adams was not involved in the assault. But we discern no admissible evidence to support

the proposition that Feldkamp knew, as a result of his investigation into the assault, that Adams was not involved. Adams, in his own declaration, makes assertions about various false statements that Feldkamp made in his report and points to certain evidentiary sources that would, he believes, expose the falsity of these statements. Adams can of course speak to his own innocence. But Adams does not have personal knowledge as to what Feldkamp knew or did not know was false, and Adams points to no evidence suggesting that Feldkamp looked at the evidence he has cited and either misrepresented what the evidence revealed and/or realized that the evidence exculpated Adams. The question is not whether Feldkamp was right or wrong in pointing the finger at Adams; it is whether he genuinely believed that Adams was culpably involved with the assault. In the employment context, we routinely hold that a disciplined or discharged employee's avowal of good work performance is insufficient to create a dispute of fact as to whether the employer believed the quality of his performance to be otherwise. *E.g.*, *Luks v. Baxter Healthcare Corp.*, 467 F.3d 1049, 1056 (7th Cir. 2006); *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006); *Lucas v. Chicago Transit Auth.*, 367 F.3d 714, 731 (7th Cir. 2004). The same principle applies here. There is no record evidence, apart from Adams' protestations, supporting a reasonable inference that Feldkamp knew that Adams was innocent of any involvement with the assault and did not honestly believe in the veracity of his own report. (For his part, Feldkamp averred in his declaration he believed the information set forth in his report to be true. R. 202-3 at 1 (declaration of Clinton Feldkamp ¶ 4).) That ends our inquiry.

In the absence of any evidence that Feldkamp pursued the assault charge out of a retaliatory motive, the officers whom

Adams alleges were influenced by Feldkamp in finding Adams guilty of this charge (or denying one or more of his appeals) likewise cannot be held liable on this claim. The district court properly granted summary judgment against Adams on the First Amendment claim.

B.  *Due process claim.*

A reminder to the reader that this section constitutes my dissent as to Adams' due process claim.

Adams pursues two theories as to how the hearings he was given on the assault charge deprived him of due process: first, that he was not given an adequate opportunity to present witnesses and access other evidence (including surveillance videos) at his hearing; and second, that he was not granted a neutral hearing officer, in that Feldkamp essentially dictated to the first two hearing officers who heard this claim how they should resolve the disciplinary charge. Because I find that Adams has presented sufficient evidence to survive summary judgment on the first of these two theories, I would remand for further proceedings on that theory. My colleagues disagree with me on that point, for the reasons set forth in Judge St. Eve's concurrence. Her concurrence also addresses the second theory regarding a neutral arbiter. I express no opinion as to that theory.

As a general matter, a procedural due process claim requires a plaintiff to show that state actors deprived him of a protected property or liberty interest and that he did not receive adequate process when he was deprived of that interest. *See Reed v. Goertz*, 598 U.S. 230, 236, 143 S. Ct. 955, 961 (2023). The process owed to a prisoner depends on the particular circumstances and what rights of the prisoner are at stake. *See*

*Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 903 (1976); *Munson v. Gaetz*, 673 F.3d 630, 637–38 (7th Cir. 2012). *See also Wolff v. McDonnell*, 418 U.S. 539, 556–58, 563–68, 94 S. Ct. 2963, 2975–76, 2978–80 (1974) (denial of prisoner's good-time credits); *Prude v. Meli*, 76 F.4th 648, 656 (7th Cir. 2023) (prison disciplinary hearings generally); *cf. Wilkinson v. Austin*, 545 U.S. 209, 125 S. Ct. 2384 (2005) (assignment to supermax prison facility which imposes atypical and significant hardship on inmate in relation to ordinary incidents of prison life).

> It is well-settled that due process in a prison disciplinary hearing requires advance notice of the charges, a hearing before an impartial decisionmaker, the right to call witnesses and present evidence (when consistent with institutional safety), and a written explanation of the outcome. [*Scruggs v. Jordan*, 485 F.3d 934, 939 (7th Cir. 2007).] At the same time, these procedural requirements are not overly rigid. *See Piggie v. Cotton*, 344 F.3d 674, 678 (7th Cir. 2003). Any procedures required in a prison "must balance the inmate's interest in avoiding loss ... against the needs of the prison, and some amount of flexibility and accommodation is required." *Wolff*, 418 U.S. at 566, 94 S. Ct. 2963 [at 2979–80]. Because of the unique issues present in the prison context and the need to maintain safety and order, "[r]ules of procedure may be shaped by consideration of the risks of error and should also be shaped by the consequences which will follow their adoption." *Id.* at 567, 94 S. Ct. 2963 [at 2980] (citations omitted).

*Prude*, 76 F.4th at 657 (footnote omitted). With respect to witnesses, our decision in *Piggie v. Cotton*, 342 F.3d 660, 666 (7th Cir. 2003) (per curiam), adds that "[a]lthough prison disciplinary committees may deny witness requests that threaten institutional goals or are irrelevant, repetitive, or unnecessary, they may not exclude witnesses requested by an offender with no explanation at all."

The finding that Adams was responsible for the assault had multiple consequences: he was deprived of good time credits, he was demoted to a lower credit-earning class, he was assigned to disciplinary segregation for a one-year period, and, based on the assault finding and other adverse disciplinary findings, he was reclassified to department-wide restrictive housing. The reclassification in particular is what led to Adams' extended assignment to restrictive housing—in multiple facilities—where he experienced the harsh conditions he has described.

In evaluating this claim, the district court made two determinations in Adams' favor that the defendants do not contest on appeal. First, in view of the two years Adams spent in department-wide restrictive housing and the harsh conditions that Adams described, the court determined that a reasonable jury could find that he was deprived of a protected liberty interest. 2021 WL 1061223, at *8. Second, the court also determined that there was a question of fact as to whether, without the adverse finding on the assault charge, Adams would have been reclassified to department-wide restrictive housing. *Id.* at *4.

The relevant question here, then, is whether Adams was deprived of due process in connection with the hearings on the assault charge. The district court reasoned that he was not,

based on the lesser degree of due process required for hearings on whether an inmate should be assigned to segregation. Recall that in both the original and the rehearing conducted on the assault charge (I will disregard the third hearing conducted after Adams' habeas petition was granted, given that the prison warden vacated the sanctions imposed at that hearing and dismissed the charge), Adams was at risk of losing good time credits, and in fact, the penalties ordered by the hearing officers included the loss of good time credits. But given that Adams' successful habeas petition had resulted in the restoration of his good time credits and his credit-earning class, "the only injury Mr. Adams challenges here is the time he spent in segregation [i.e., restrictive housing]." *Id.* at *7. Citing our decision in *Westefer v. Neal*, *supra*, 682 F.3d at 685, the district court reasoned that assignments to segregation, even disciplinary segregation, demand only that an inmate be given an "opportunity to present his views" rather than a full-blown hearing, and that "[i]f the prison holds a hearing, inmates do not have a constitutional right to call witnesses or to require prison officials to interview witnesses." 2021 WL 1061223, at *7. Consequently, the district court concluded that the record did not support a finding that Adams was deprived of due process.

But this analysis is inconsistent with the chronology of events and the way in which the assault finding contributed to the reclassification determination that resulted in Adams' assignment to department-wide restrictive housing. As one of the eight predicates for the reclassification determination (and one of the seven predicates for the follow-up reclassification determination in 2018), the assault conviction is relevant less for what particular types of discipline were imposed at the assault hearing than for the underlying

finding that Adams had participated in the assault on another prisoner. *Cf. Love v. Vanihel*, 73 F.4th 439, 451–52 (7th Cir. 2023) (op. of Brennan, J.) (distinguishing between disciplinary hearing which resulted in finding of guilt—which inmate's procedural due process claim did not challenge—and discretionary decision as to what penalties were warranted—as to which inmate argued additional process was due). That finding, in turn, was rendered in a hearing where Adams was exposed to disciplinary penalties including the loss of good time credits—and, in fact, the hearing officer ultimately did sanction Adams with the loss of 365 days of earned good time credits in addition to one year of disciplinary segregation. The same was true in the October 20, 2017 rehearing in the assault case, where Adams was again found guilty and the sanctions imposed again included the loss of earned good time credits. Given Adams' exposure to the loss of good time credits in both the original hearing and the rehearing on the assault charge, he was entitled, *inter alia*, to present relevant live witness testimony, and the hearing officer's decision to refuse testimony even from an exculpatory witness like Barnett, without explanation, amounted to a denial of his due process rights under *Wolff*, as Judge Magnus-Stinson would later rule in granting Adams' request for a writ of habeas corpus. *Adams v. Sup't*, 2018 WL 4077022, at *3 (citing, *inter alia*, *Whitlock*, 133 F.3d at 388); *see also Edwards v. Balisok*, 520 U.S. 641, 646–47, 117 S. Ct. 1584, 1588 (1997); *Sup't, Mass. Correct. Inst., Walpole v. Hill*, 472 U.S. 445, 454, 105 S. Ct. 2768, 2773 (1985); *Wolff*, 418 U.S. at 566–67, 94 S. Ct. at 1979–80; *Ellison v. Zatecky*, 820 F.3d 271, 274 (7th Cir. 2016); *Donelson v. Pfister*, 811 F.3d 911, 917–18 (7th Cir. 2016).

On March 21, 2017, five days after the original assault hearing and conviction, a prison official reclassified him to

department-wide restrictive housing, citing the eight conduct violations Adams was found to have committed within the previous year, including the assault violation, which was arguably one of the more serious, if not the most serious, of the eight violations cited. One year later, after Adams' conviction on the drug charge was vacated in February 2018 and he pleaded guilty to a lesser offense, Adams was again assigned to department-wide (administrative) restrictive housing based on the now-seven violations he had committed over the course of the previous two years. The latter reclassification decision specifically noted that one of those seven disciplinary infractions had resulted in serious bodily injury to another inmate, which appears to have been a reference to the assault violation. So as the district court noted, there is a record basis on which a factfinder could readily conclude that the assault finding contributed to the reclassification.

To my mind, nothing about the grant of habeas relief in August 2018, which restored to Adams the good time credits that had been revoked as a result of the assault hearing (and rehearing) should alter the analysis. As a historical matter, it remains the case that the finding that Adams had committed the assault was one of the triggers for the reclassification decision, and whether or not good time credits were taken away from Adams has no bearing on that causal connection. I understand the district court's point that once Adams' good time credits and his credit-earning class were restored by way of his successful habeas petition, the only remaining penalty imposed on him in the assault hearing (and rehearing) was the order that he serve a year in disciplinary segregation, a penalty that the district court believed warranted only a lesser level of process and did not require that Adams be given the right to call witnesses. I assume, without deciding, that the

district court was correct on this point. *But see Williams v. Brown*, 849 F. App'x 154, 157 (7th Cir. 2021) (non-precedential decision) ("There is no question here that Williams adequately pleaded deficient procedure in the disciplinary process that led to his punitive segregation. He alleged that the defendants violated his due process rights by filing a disciplinary report that did not notify him of the details of his charges and by *refusing to call or interview his witnesses*.") (emphasis mine) (citing *Wolff*, 418 U.S. at 563–69, 94 S. Ct. at 2978–81). If Adams were challenging the validity of the hearing officer's order that he spend one year in disciplinary segregation, this might matter. But he is not. His claim, as I understand it, is focused on the assault finding as a *predicate* for the reclassification decision that assigned him to department-wide restrictive housing.

To be clear, I am not proposing to hold that when the sole penalty that a prisoner faces in a disciplinary hearing is assignment to segregation (for however long a period of time), he necessarily is entitled to witness testimony at the hearing. Nor am I suggesting that a reclassification decision assigning a prisoner to department-wide restricting housing itself requires a hearing at which he is entitled to witness testimony. I would hold only that where a prisoner has been reclassified to department-wide restrictive housing based in part on a prior disciplinary finding rendered at a hearing where the prisoner was in fact exposed to the loss of good time credits, he may assert a due process challenge to that disciplinary hearing (and, in turn, the reclassification decision based on the result of that hearing) on the ground that he was not permitted to present witness testimony in defending himself against the disciplinary charge.

Because the assault finding was rendered in a hearing (and later a rehearing) in which Adams was, in fact, exposed to the loss of good time credits, he was entitled to live witness testimony absent some justification for why such testimony was not appropriate or feasible. *See Hill*, 472 U.S. at 454, 105 S. Ct. at 1588 ("[w]here a prison disciplinary hearing may result in the loss of good time credits," *Wolff* requirements, including opportunity to call witnesses, apply). And because he was deprived of that right, the hearing as conducted violated his right to procedural due process, as the habeas court concluded.[6]

There is a question of fact as to whether, had Adams been granted the right to call witnesses, he would have been exonerated of the assault charge, and this in turn results in a second question of fact as to whether, absent the assault finding, Adams would have been reclassified to department-wide restrictive housing. Adams is entitled to have a factfinder resolve these questions, and if resolved favorably to him, to determine what injuries he suffered as a result of the reclassification. In my view, the district court therefore erred in entering summary judgment on this claim against Adams. I

---

[6] Although, as noted, Adams was allowed to call at least some witnesses at the third hearing, I am not prepared to say on the current record that he had a sufficient opportunity to present testimony in support of his defense and that the hearing officer's decision to convict him at that hearing shows that the due process violations at the previous two hearings on the assault charge were harmless. *See*, *e.g.*, R. 217 at 87–88 (Adams Dep. 86–87) (regarding inmate Barnett, Adams testifies that he was only allowed to submit inmate Barnett's written statement at the third hearing and believes he was not allowed to call Barnett to testify, although he is not positive).

respectfully dissent from the court's decision to instead affirm the judgment as to the due process claim.

C. *Equal protection claim.*

The equal protection claim is premised on the notion that Feldkamp discriminated against Adams based on his race in drafting his disciplinary report on the assault incident and recommending that Adams be charged, and that the successive officers who found Adams guilty of the assault and ordered him punished (and denied his appeals) were in turn influenced by Feldkamp's purportedly discriminatory recommendation. Absent direct evidence of a racial animus on Feldkamp's part, Adams (who is Black) must show that he was treated differently from a similarly situated individual of a different race owing at least in part to a discriminatory motive. *See Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264–65, 97 S. Ct. 555, 563 (1977); *Brown v. Budz*, 398 F.3d 904, 916 (7th Cir. 2005).

Adams cites Garretson (who is White) as his comparator. We can assume for present purposes that the two were similarly situated, in that both were involved (per Feldkamp) in the assault upon another prisoner. But Adams has not identified evidence that the two were treated differently: both were charged and found guilty in connection with the assault and both were penalized with one year in disciplinary segregation. Adams points out that he was ordered to serve a total of two years in segregation, but of course the second year was the result of the guilty finding on the cell phone charge. Adams appears to suggest that because the cell phone charge involved a phone that was confiscated on November 9, 2016, but he was not charged for the cell phone until February 23, 2017—less than three weeks after the assault—the cell phone

charge was essentially a vehicle to penalize him for the assault. But beyond his own speculation, Adams cites no evidence supporting any connection between the two charges.

Adams also posits that he was treated more harshly than Garretson in that he (Adams) was innocent of the assault, whereas Garretson was guilty. This may be true from Adams' perspective, but—so far as the record reveals—not from the defendants' point of view. Feldkamp concluded, as a result of his investigation, that Adams ordered the assault, and the hearing and review officers who subsequently examined the evidence likewise concluded that Adams was culpable. Again, they may all have been wrong, but there is no admissible evidence suggesting that either Feldkamp or the hearing and review officers did not genuinely believe that Adams, like Garretson, was culpable.

Alternatively, Adams cites various remarks and actions on the part of Feldkamp that purport to directly show racial bias on his part, including his use of urban slang to address a hearing officer who emailed him regarding one of Adams' appeals, his evident distaste when Adams explained that one of his tattoos depicted the African continent, and his interest, in the course of investigating the assault, as to whether officer Nelson favored Black inmates. We agree with the district court that none of these statements or actions, considered separately or together, is sufficient to support an inference that Feldkamp's actions vis-à-vis Adams were animated by racial bias.

Because the evidence does not support a finding that Adams was treated more harshly than Garretson, or that Feldkamp took adverse action against Adams out of racial bias,

the district court properly granted summary judgment on this claim in favor of the defendants.

D. *Eighth Amendment claim.*

The Eighth Amendment claim posits that the conditions of department-wide restrictive housing were so harsh as to have deprived Adams of "'the minimal civilized measure of life's necessities,' creating an excessive risk to [his] health and safety," *Isby v. Brown*, 856 F.3d 508, 521 (7th Cir. 2017) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S. Ct. 2392, 2399 (1981)), and that the defendants subjected him to these conditions with "a culpable state of mind," *id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970, 1977 (1994)). We need not reach the first of these two elements. The dispositive question is whether Feldkamp or the hearing and review officers can be charged with subjecting Adams to the harsh conditions of restrictive housing.[7] There is no evidence that they had control over the conditions in restrictive housing (how long he was confined to his cell, how often he was fed, and so on). Indeed, as of the June 30, 2017 transfer to the Wabash Valley facility, Adams was no longer housed at Plainfield, where Feldkamp and the hearing and review officers remained. It is true, as Adams points out, that a defendant's knowledge of conditions that pose a risk of serious harm to an inmate may give rise to Eighth Amendment liability when coupled with evidence supporting an inference that the defendant was deliberately indifferent to the inmate's plight, i.e., that the

---

[7] Adams has waived any Eighth Amendment claim against Carter as the then-IDOC Commissioner. Apart from his failure to develop such a claim below, he does not separately discuss the prospective basis for Carter's liability on the Eighth Amendment claim in his briefs on appeal.

defendant intentionally or recklessly disregarded the risk of harm to the inmate. *See Farmer*, 511 U.S. at 834, 114 S. Ct. at 1977; *Haywood v. Hathaway*, 842 F.3d 1026, 1031 (7th Cir. 2016) (per curiam). But this presumes—apart from whether any of the defendants here knew what the conditions of restrictive housing were outside of the Plainfield facility—that the defendant has some authority over the conditions and a responsibility to address them. *See, e.g., Gray v. Hardy*, 826 F.3d 1000, 1008 (7th Cir. 2016) (evidence indicated that prison warden not only knew of ongoing problem with infestation of vermin, insects, and birds in inmate's cell, but was personally responsible for changing prison policies so that those conditions would be addressed).

Our decision in *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009), rejects the notion that simply because a prison employee is on notice of conditions that may violate the Eighth Amendment, he necessarily has a duty to respond (and may be held liable if he does not), regardless of whether those conditions are within his purview. *See also Figgs v. Dawson*, 829 F.3d 895, 903–04 (7th Cir. 2016); *George v. Smith*, 507 F.3d 605, 609–10 (7th Cir. 2007). The defendant at issue in *Burks* was a grievance handler, Salinas, who processed two of the plaintiff-inmate Burks' grievances about an untreated eye condition, one of which she dismissed as untimely. Given that the latter grievance placed Salinas on notice of Burks' need for medical treatment, Burks alleged that she could be held liable for the injury he suffered when it remained untreated. We disagreed:

> Salinas did not create the peril facing Burks or do anything that increased the peril, or made it harder for Burks (or anyone else) to solve the

> problem. The most one can say is that Salinas
> did nothing, when she might have gone beyond
> the requirements of her job and tried to help
> him. A layperson's failure to tell the medical
> staff how to do its job cannot be called deliber-
> ate indifference; it is just a form of failing to sup-
> ply a gratuitous rescue service.

555 F.3d at 596. By contrast, we did agree that Burks had a viable claim against the individual who managed the prison medical unit, as she was not only in a position to have known about Burks' eye condition, but had the authority to address it presuming she did have such knowledge. *See id.* at 594.

By virtue of their handling of the assault charge, Feldkamp and the other officers arguably may have been responsible for Adams' reclassification to department-wide restrictive housing; and if they violated his rights in charging him with assault and finding him guilty of that offense (if they actually did deprive him of procedural due process, for example), they could be held liable for that particular wrong. Any depriva- tions and injuries that Adams suffered in restrictive housing would certainly be relevant to his damages on such a claim. With respect to the Eighth Amendment, however, the restric- tive housing conditions that Adams has described were not unique to him, and there is no evidence that any of the de- fendants here created those conditions or somehow made them worse for Adams in particular; they were the same con- ditions that would have faced any inmate assigned (rightly or wrongly) to restrictive housing. Even assuming that the de- fendants were aware of the conditions of that unit at

Plainfield and at Wabash Valley,[8] there is no evidence that their positions within the prison charged them with any responsibility for the conditions in that unit or gave them the authority to change those conditions—there is no evidence that they had anything to do with the restrictive housing unit *at all*. Consequently, they cannot be held to account for the conditions Adams has described.[9] The district court correctly entered summary judgment against Adams on this claim.

---

[8] By the time Adams was deposed in 2020, he was assigned to the New Castle Correctional Facility, where he remained in restrictive housing. But so far as we can discern from the record, his transfer to that facility occurred subsequent to the events at issue in this case.

[9] We do not understand our ruling to be inconsistent with the district court's decision in *Vermillion v. Levenhagen*, 2018 WL 2321112 (S.D. Ind. May 22, 2018), which Adams has cited in support of his claim. Like Adams, Vermillion alleged that he was wrongfully assigned to punitive segregation and then transferred to a form of restrictive housing where he was placed in solitary confinement and forced to endure conditions of confinement that allegedly violated his Eighth Amendment rights. On summary judgment, the district court allowed this claim to proceed against four defendants, and in so doing the court noted that these defendants either knew or should have known that Vermillion had experienced harsh conditions in solitary confinement for over three years and that because these defendants were also personally involved in his assignment to restrictive housing and in keeping him there, a jury could find that they had "deliberately subjected Vermillion" to the harsh conditions he had endured. *Id.* at *10–*11. But more than that, those defendants also occupied positions within the prison and IDOC that made them responsible in various ways for the conditions within the restrictive housing unit: one defendant was the prison superintendent, a second was IDOC's director of operations, a third was an administrative assistant who oversaw the restrictive housing unit, and the fourth was a case manager who worked in that restrictive housing unit. *See id.* at *3–*4.

**III.**

For the reasons set forth in Sections II.A., II.C., and II.D. of this opinion and in the concurring opinion, we AFFIRM the district court's judgment.

ST. EVE, *Circuit Judge*, joined by KIRSCH, *Circuit Judge*, concurring.[1] I join all parts of the majority opinion except the holding on Adams's procedural due process claim. I respectfully disagree that Adams's procedural due process claim should proceed on his theory that he was not given an adequate opportunity to present witnesses and access other evidence at his assault charge hearing. Nor can the neutral arbiter theory proceed. Adams's claim that Feldkamp called the shots in one of his assault hearings is disquieting, but later proceedings corrected that procedural misstep. Put another way, any error was harmless. I would affirm the district court across the board.

Our law is clear that an inmate who is facing transfer to disciplinary segregation is entitled only to "informal, nonadversarial due process," which "leave[s] substantial discretion and flexibility in the hands of the prison administrators." *Westefer v. Neal*, 682 F.3d 679, 684–85 (7th Cir. 2012). Informal due process calls for notice of the reasons for the inmate's placement and "an opportunity to present his views." *Id.* And the Supreme Court has made clear that "[o]rdinarily a written statement by the inmate will accomplish this purpose …. So long as this occurs, and the decisionmaker reviews the charges and then-available evidence against the prisoner, the Due Process Clause is satisfied." *Hewitt v. Helms*, 459 U.S. 460, 476 (1983), *abrogated on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995); *see also Westefer*, 682 F.3d at 685. Consistent with this right, Adams was given the opportunity to present

---

[1] This opinion sets forth the opinion of the majority of the court as to the procedural due process claim.

his arguments orally during the assault charge hearings. This satisfies the Due Process Clause.

The dissent nonetheless concludes that Adams was deprived of due process in connection with the assault charge hearing because he was entitled to present live witness testimony. According to the dissent, because the hearing included the potential loss of good time credit as well as segregation, Adams should have been able to present live testimony. It is uncontested, however, that Adams's good time credits were restored. The only issue, therefore, is whether he should have received more process for his transfer to a more restrictive prison setting. He should not have. In holding otherwise, the dissent improperly bootstraps this hearing about disciplinary segregation into one about the loss of good time credits, all because one of eight underlying violations (which is not at issue here) might have called for more process. Our law does not support this expansion of his rights.

Adams similarly cannot proceed on his claim that he did not receive an impartial decisionmaker. Due process entitles a prisoner to an impartial decisionmaker during a prison disciplinary hearing. *Prude v. Meli*, 76 F.4th 648, 657 (7th Cir. 2023). That is so even under the informal due process standard set forth in *Westefer*. *See* 682 F.3d at 685. Adams adduced an affidavit suggesting Feldkamp's influence tainted the hearings Peltier oversaw in the March 2017 assault case. Per the affidavit, Peltier had told Adams that "higher ups" had predetermined the outcome of the hearings, adding that Feldkamp was going to make sure that Adams went to segregation for "a long time." The allegedly biased Feldkamp even followed up on Adams's case later, intervening as another

officer, Andrews, reviewed Adams's procedural challenges. That is not the model of due process.

Still, any failure to provide a neutral arbiter at that stage was harmless. The outcome of the Peltier hearings was initially a conviction in the assault case, which was later overturned. Then in September 2018, Hearing Officer Carpenter presided over another case with the same conduct—finding Adams guilty. Adams does not challenge the impartiality of Officer Carpenter. In the end, an internal administrative appeal process concluded that the allegations against Adams had been too vague to support the assault charge. This is due process at work, even if Adams did not get a fair shake in front of Peltier. Through Carpenter and the appeals process, Adams secured a neutral adjudication, a fair appellate decisionmaker, and ultimately the charge's dismissal and expungement.

For these reasons, I would affirm the district court in all respects.