In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 23-1228

COURTNEY EALY,

*Plaintiff-Appellant,*

*v.*

CAMERON WATSON, Warden, DAVID D. FRANK, and ANGELA McKITTRICK,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Central District of Illinois.
No. 20-cv-03027 — **James E. Shadid**, *Judge.*

———————————

ARGUED MAY 20, 2024 — DECIDED JULY 30, 2024

———————————

Before FLAUM, BRENNAN, and KOLAR, *Circuit Judges.*

KOLAR, *Circuit Judge.* Plaintiff-Appellant Courtney Ealy is incarcerated in the Illinois prison system and spent five consecutive months in segregation beginning in 2019. While in segregation, inmates are removed from the general prison population and typically lose various privileges, like yard time or in-person visits. In Ealy's case, he not only lost privileges, but also experienced cold temperatures, dirty cells, and

faulty plumbing resulting in unsanitary conditions, which he says negatively affected his mental and physical health. Ealy sued several prison officials, alleging that they violated his Fourteenth Amendment right to due process. During the litigation, Ealy filed successive motions for recruitment of counsel.

Ealy now appeals the district court's grant of summary judgment in favor of defendants-appellees Cameron Watson, David D. Frank, and Angela McKittrick, and its denial of his motions for recruitment of counsel. Because this case rises and falls on the fact that Ealy received due process before being placed in disciplinary segregation, his Fourteenth Amendment claim fails. Further, the district court did not abuse its discretion in denying Ealy's motions for recruitment of counsel. We therefore affirm.

## I.   Background

At this stage, we give Ealy the benefit of all reasonable inferences that may be drawn from the evidentiary record and resolve any factual disputes in his favor. *Adams v. Reagle*, 91 F.4th 880, 887 (7th Cir. 2024).

Ealy received a disciplinary report in the fall of 2019 while imprisoned at Western Illinois Correctional Center. The report stated that multiple inmates located on one wing of Western had tested positive for THC and that three confidential sources claimed Ealy had provided the drugs. According to the sources, Ealy had been receiving marijuana from a female visitor, whom we'll refer to as T.B., during visitation hours. Following the inmates' positive tests, prison officers conducted several interviews with other inmates, listened to Ealy's recorded phone calls, and reviewed surveillance

footage of Ealy's visits. During one such visit, T.B. was seen retrieving an item from "the crotch area of her sweatpants" and placing it among candies on a napkin in front of Ealy. Ealy was then seen picking up the item and swallowing it. The disciplinary report also explained how the day before the visit, Ealy had placed a call to T.B. using another inmate's PIN number. During the call, Ealy told T.B. to "[m]ake sure you got [it]" and reminded T.B. to "be smooth."

As a result of this alleged conduct, Ealy was accused of violating three prison rules. The disciplinary report informed Ealy that he had "the right to appear and present a written or oral statement or explanation" at his disciplinary hearing and that he could request staff assistance to prepare a defense, as well as a reasonable extension of time to prepare. The report also included a form for requesting witnesses. Ealy did not fill out the form and refused to sign the report. He did, however, file a grievance, and maintains that he later submitted a request for witnesses on a different sheet of paper. His grievance was ultimately denied, and aside from Ealy's deposition testimony, there is no record of his request to call witnesses.

Western's adjustment committee held a hearing eight days after Ealy received the disciplinary report. The adjustment committee consisted of defendants David Frank and Angela McKittrick. Ealy admitted to two other violations—neither is at issue on appeal—but pleaded not guilty to the drug offense. At the hearing, Ealy presented his defense, stating that he did not test positive for drugs, that if he had introduced marijuana into Western, he would have used it himself, and that his phone conversation with T.B. was about smuggling a debit card into Western, not drugs. During the hearing, Ealy also requested a continuance to review the surveillance footage of

his alleged receipt of marijuana in the visitors' room. The committee denied that request.

After considering the evidence before it, the adjustment committee ultimately found Ealy guilty of bringing marijuana into Western. In its final report, which was provided to Ealy, the committee cited the confidential sources' statements, the recorded phone call, and the visitors' room surveillance footage as evidence supporting its finding. Frank later represented during this litigation that the adjustment committee viewed the footage and spoke to the investigating officer prior to the hearing.

The committee recommended five months of segregation, six months of "C-grade" status (which meant the loss of certain privileges), six months of restricted contact visits, and a disciplinary transfer to another facility as punishment. Cameron Watson, Western's Warden, approved these disciplinary recommendations.

At the root of Ealy's appeal are the conditions he faced in segregation at two Illinois prison facilities. Ealy spent a total of five months in segregation—one month in administrative segregation while the Western investigation was ongoing and four months in disciplinary segregation. From the start, conditions were poor. Ealy's first segregation cell at Western had faulty plumbing such that other inmates' waste flowed up into Ealy's toilet, causing foul odors. The cell also contained bugs and spider webs and was "freezing" due to an alleged lack of heat. Ealy was moved within Western to various segregation cells during this time, but they were consistently cold, especially as autumn temperatures dropped outside. While in segregation at Western, Ealy suffered from depression and was placed on crisis watch after attempting suicide.

Ealy was then transferred to Lawrence Correctional Center on October 23, 2019, approximately two months into his segregation sentence. His cell at Lawrence had a "metal cage" around the outside of the window that partially blocked natural light from entering the cell. Light was further blocked by a bird's nest and feathers that accumulated within the cage. According to Ealy, he experienced vision problems and was prescribed eyeglasses due to the lack of natural light. Like his segregation cells at Western, Ealy's segregation cell at Lawrence was "filth[y]." Throughout his stint in segregation, Ealy was denied in-person visits and recreation time.

Ealy was released into Lawrence's general population on January 26, 2020, after serving his five-month term in segregation. Around that same time, Ealy filed a pro se complaint under 42 U.S.C. § 1983 against Frank, McKittrick, and Watson.[1] Ealy alleged, among other things, that his Fourteenth Amendment due process rights were violated during the disciplinary hearing because he was denied access to the video surveillance footage, was not given the opportunity to call witnesses, and did not receive an adequate written explanation of the reasons for his discipline. He further alleged that the "inhumane cell[s]" made him sick, exacerbated his mental illness, and caused his eyes to "improperly function." While the district court dismissed certain claims and defendants early on, Ealy's Fourteenth Amendment due process claim survived.

On the same day he filed his complaint, Ealy also filed the first of several motions for recruitment of counsel. In support of his motion, Ealy cited difficulty focusing due to his

---

[1] Other defendants have since been dismissed.

antidepressant medication and noted that he had neither completed high school nor participated in a civil case before.

The defendants moved for summary judgment on Ealy's due process claim, disputing that Ealy was owed due process at all. The district court granted their motion, holding that Ealy did not demonstrate a protected liberty interest in his segregation sentence to trigger due process protection, and that even if he had, his due process rights were not violated.

The district court also denied Ealy's motions for recruitment of counsel, finding that Ealy's claim was "not complex and [was] adequately stated in his complaint," and that despite any alleged side effects from his medication, Ealy "seem[ed] competent to represent himself based on his filings." The district court stated that it would enter a scheduling order "with important information" to assist Ealy during discovery, and later did so.

Ealy appeals both the summary judgment decision and the denial of his motions for recruitment of counsel. He argues that summary judgment was improper because the record supports that his confinement in segregation deprived him of a protected liberty interest without due process of law. Ealy also asserts that the district court abused its discretion in denying his motions for recruitment of counsel, and that he was prejudiced by its denial.

## II.    Discussion

We begin with a discussion of whether summary judgment was appropriate on Ealy's due process claim before turning to the district court's denial of Ealy's motions for recruitment of counsel.

## A.  Ealy's Due Process Claim

We review the district court's grant of summary judgment de novo, "constru[ing] the evidence in the light most favorable to the nonmoving party," Ealy, and "draw[ing] all reasonable inferences in his favor." *Gillis v. Litscher*, 468 F.3d 488, 492 (7th Cir. 2006).

Ealy first argues that he was deprived of a protected liberty interest by being confined in segregation for five months, and, as such, was owed—but not afforded—due process. The Due Process Clause of the Fourteenth Amendment prohibits the deprivation "of life, liberty, or property, without due process of law," U.S. Const. amend. XIV, and those who seek to invoke its protection "must establish that one of these interests is at stake." *See Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). To succeed on a due process claim stemming from a prison disciplinary proceeding, an inmate must demonstrate (1) a constitutionally protected liberty interest and (2) deficient procedures attendant to the deprivation of that interest. *Lisle v. Welborn*, 933 F.3d 705, 720 (2019); *see also Wilkinson*, 545 U.S. at 220–21. Thus, the question is whether a protected liberty interest exists, and if so, whether Ealy received adequate process to protect it.

### i.        Liberty Interest

The district court concluded that Ealy was not deprived of a liberty interest because his segregation conditions did not impose an "atypical and significant hardship." Disciplinary segregation deprives an inmate of his liberty interest when it imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). We look to the "combined

import of the duration of the segregative confinement *and* the conditions endured." *Hardaway v. Meyerhoff*, 734 F.3d 740, 743 (7th Cir. 2013).

It is true that under our precedent, five months in segregation, standing alone, is not enough to implicate a liberty interest that triggers due process rights. *See, e.g.*, *Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 698 (7th Cir. 2009) (Six months in segregation is "not such an extreme term and, standing alone, would not trigger due process rights.") (internal quotation marks omitted); *Hardaway*, 734 F.3d at 744 (same). Fewer than six months in segregation, however, may still establish a liberty interest "depending on the conditions of confinement." *Kervin v. Barnes*, 787 F.3d 833, 836 (7th Cir. 2015). So, we look to the conditions of Ealy's confinement to determine whether he had a protected liberty interest.

On this front, Ealy asserts—and indeed, defendants *do not dispute*—that he endured cells in segregation that had poor plumbing and associated odors, were cold and dirty, and contained bugs and spider webs.[2] At oral argument, defense counsel even referred to "[Ealy's] cage in Lawrence"—also undisputed. Ealy testified at his deposition that these conditions differed from those in general population at both Western and Lawrence.

---

[2] We need not address the defendants' new contention that Ealy's liberty interest argument fails because the defendants did not know about the conditions of his confinement and did not act "deliberate[ly]." Arguments not properly raised before the district court at summary judgment are waived. *See, e.g.*, *United States v. 5443 Suffield Terrace*, 607 F.3d 504, 509 (7th Cir. 2010).

Faced with these facts, and drawing all reasonable inferences in Ealy's favor as we must, we decline to decide this case by addressing whether Ealy's segregation amounted to an atypical and significant hardship. We need only address whether Ealy was afforded all the process he was due.

### ii.   Process Afforded

Whether Ealy possessed a protected liberty interest here does not dictate the outcome of this appeal, because even if Ealy had established such an interest, he received due process prior to any deprivation. As the district court found, the record below is clear: Ealy did not demonstrate his due process rights were violated during his disciplinary hearing.

In reaching its conclusion, the district court applied *Scruggs v. Jordan*, 485 F.3d 934 (7th Cir. 2007). Our precedent in *Scruggs* requires the following due process procedures in prison disciplinary proceedings: "(1) advance (at least 24 hours before hearing) written notice of the claimed violation; (2) the opportunity to be heard before an impartial decision maker; (3) the opportunity to call witnesses and present documentary evidence (when consistent with institutional safety); and (4) a written statement by the fact-finder of the evidence relied on and the reasons for the disciplinary action." 485 F.3d at 939. Ealy received advanced written notice of the alleged violation (he received the disciplinary report eight days before his hearing), the opportunity to be heard before an impartial decision maker (he spoke before adjustment committee members, none of whom were involved in the investigation or initial disciplinary report), the opportunity to call witnesses and present evidence (Ealy was provided with a witness request form, although he did not fill it

out), and he received the final written adjustment committee report containing the basis for the committee's decision.

Thus, even under a stringent due process standard, Ealy's claim cannot survive summary judgment. However, this court's recent decision in *Adams v. Reagle* crystalized the process owed to inmates facing only disciplinary action like segregation, rather than disciplinary action affecting the length of their carceral sentence, like a reduction in good-time credit. *Adams*, 91 F.4th at 895. As set forth in *Adams*, "an inmate who is facing transfer to disciplinary segregation is entitled only to 'informal, nonadversarial due process,' which 'leave[s] substantial discretion and flexibility in the hands of the prison administrators.'" *Id.* (quoting *Westefer v. Neal*, 682 F.3d 679, 684–85 (7th Cir. 2012)). This "informal, nonadversarial due process" standard is the correct one to apply here given that Ealy did not face disciplinary action that could affect the length of his sentence.

A creature of due process, informal due process requires only that an inmate is provided (1) "notice of the reasons for the inmate's placement" in segregation and (2) "an opportunity to present his views," for instance, in a written statement or at a hearing. *Id.* "[T]he Supreme Court has made clear that '[o]rdinarily a written statement by the inmate will accomplish this purpose …. So long as this occurs, and the decisionmaker reviews the charges and then-available evidence against the prisoner, the Due Process Clause is satisfied.'" *Id.* (quoting *Hewitt v. Helms*, 459 U.S. 460, 476 (1983)).

Applying *Adams*, we reach the same result as the district court did under *Scruggs*. Ealy urges that his due process rights were violated because he (1) was not permitted to view the visiting room video footage, (2) was not allowed to question

witnesses, and (3) the adjustment committee's decision lacked a sufficient explanation. We disagree.

Ealy first insists that he was entitled to the visitors' room surveillance tape because withholding it limited his ability to defend himself at the disciplinary hearing. In so arguing, Ealy relies on *Piggie v. Cotton*, 344 F.3d 674 (7th Cir. 2003). But *Piggie* is different in several respects.

In *Piggie*, an inmate filed a federal habeas corpus petition challenging a prison disciplinary board's determinations against him and alleging he was denied due process when he was refused access to video footage depicting a battery he allegedly committed. *Id.* at 676. In analyzing the due process claim, we reiterated that the rule of *Brady v. Maryland*, 373 U.S. 83 (1963), requiring the disclosure of material, exculpatory evidence, applies to prison disciplinary proceedings. *Piggie*, 344 F.3d at 678. An inmate is entitled to disclosure of "material, exculpatory evidence" unless its disclosure would "unduly threaten institutional concerns." *Id*. Because the inmate in *Piggie* demonstrated that the footage was material and potentially exculpatory—including by explaining what he believed the video showed and by putting forth a prison official's memorandum stating that he could not be seen committing the offense on the video—we vacated and remanded in part. *Id*. at 678–79. On remand, we instructed the district court to first consider whether the state had a valid security reason for withholding the video and then whether it contained exculpatory information as the inmate suggested. *Id*.

Importantly, in *Piggie*, the inmate faced a potential loss of good-time credit, which, as we've said, triggers a formal, rather than informal due process analysis. *Id*. at 676–77. But setting aside whether *Brady* applies in the informal due process

context, Ealy still needed to establish—like the inmate in *Piggie* did—that the footage was potentially exculpatory in order to be entitled to view it (absent a security concern, which defendants did not raise). *Id*. at 678–79. On the summary judgment record before us, he has not done so.

Ealy's case further diverges from *Piggie*. Unlike the inmate in *Piggie*, Ealy received a written description of the video's contents before the disciplinary hearing and never moved to compel production of the footage during litigation, despite the district court's instruction on how to do so. Ealy also does not dispute that the adjustment committee viewed the video footage; indeed, the footage is cited as evidence in the committee's final report. On this record, neither informal due process—nor our decision in *Piggie*—commands a different result with respect to the surveillance footage. *Adams*, 91 F.4th at 895.

Ealy next argues that he should have been allowed to call witnesses at his hearing. But Ealy was provided with the opportunity to request witnesses. Ealy admits he received the witness request form, yet he did not fill it out or return it to prison officials. While Ealy says he later submitted a separate sheet of paper containing his request, there is no written record of this. In any event, Ealy had the opportunity to "present his views" at the disciplinary hearing, as informal due process requires—he did just that with his statements to the adjustment committee. *Id.* at 895–96.

Finally, Ealy argues that the adjustment committee's explanation for its decision was insufficient. Ealy was notified of the claims against him eight days before the disciplinary hearing and was then provided with a final report explaining the committee's findings after it. Moreover, the adjustment

committee reviewed the charges against Ealy and the available evidence. It reviewed the initial disciplinary report, spoke to the investigating officer, confirmed the reliability of the confidential informants' statements (based on corroborating statements obtained in separate interviews), viewed the surveillance footage, and considered Ealy's own statements at the disciplinary hearing. After examining the evidence, the committee found Ealy guilty. The final report provides the basis for the decision, evidence relied upon, and a brief record of the hearing, which includes the statements Ealy made in his defense.

Accordingly, Ealy received the process he was due, and summary judgment was appropriate.

## B. Denial of Ealy's Motions for Recruitment of Counsel

Finally, we turn to the district court's denial of Ealy's motions to recruit counsel, which we review for abuse of discretion. *Pruitt v. Mote*, 503 F.3d 647, 658 (7th Cir. 2007). We will find an abuse of discretion only if the record "contains no evidence upon which the court could have rationally based its decision," the decision was based on erroneous conclusions of law or clearly erroneous factual findings, or if the decision "clearly appears arbitrary." *Id*.

"There is no constitutional or statutory right to court-recruited counsel in federal civil litigation." *Santiago v. Walls*, 599 F.3d 749, 760 (7th Cir. 2010). We have emphasized that the decision to recruit counsel "belongs with the district court," which has a considerable advantage over reviewing courts "having seen how the plaintiff handled himself in the pretrial proceedings." *Pruitt*, 503 F.3d 647 at 658 (cleaned up). The

question is "not whether [this court] would have recruited a volunteer lawyer" to assist the plaintiff under the circumstances, "but whether the district court applied the correct legal standard and reached a reasonable decision based on [the available] facts" at the time. *Watts v. Kidman*, 42 F.4th 755, 761 (7th Cir. 2022) (cleaned up). Here, the district court did not abuse its discretion in denying Ealy's motions.

In considering a motion to recruit counsel, a court must first ask whether "the indigent plaintiff made a reasonable attempt to obtain counsel or [has] been effectively precluded from doing so." *Pruitt*, 503 F.3d at 654. The district court correctly found that Ealy made reasonable attempts to recruit counsel, and thus next examined whether "given the difficulty of the case," Ealy "appear[ed] competent to litigate it himself." *Id*. This, of course, is an individualized and practical inquiry involving substantial, although not unbridled, discretion. *See id.* at 661; *see also Santiago*, 599 F.3d at 765 (Review of the denial of a motion to recruit counsel under an abuse of discretion standard "is not the equivalent of no review at all."). Courts may consider factors like the plaintiff's communication skills, education level, prior litigation experience, and performance to date in the ongoing litigation. *Pruitt*, 503 F.3d at 655.

The district court's text orders denying Ealy's motions to recruit counsel cite the correct legal standard outlined in *Pruitt* and analyze whether Ealy appeared competent to litigate his case. For example, in finding he was competent, the court noted that Ealy had only one remaining claim against defendants, which was "adequately stated in his complaint" and "not complex," and that despite Ealy's contention that his medication would prevent him from effectively litigating,

Ealy "seem[ed] competent to represent himself" based on his filings. Throughout the course of the litigation, the court also addressed the specific hurdles Ealy's motions to recruit counsel said he faced and offered solutions—such as filing a motion to compel discovery that Ealy sought or filing a motion for a continuance when law library access had been restricted. A district court "need not address every point raised in recruitment motions," and the court's text orders here "specifically address[ed] [the] certain circumstances" raised in Ealy's motions for recruitment "that warranted discussion." *McCaa v. Hamilton*, 893 F.3d 1027, 1032 (7th Cir. 2018).

We pause to consider the district court's comments that Ealy's case "require[d] [no] medical testimony" and its suggestion that Ealy may have "confused [his] cases" when seeking counsel to assist with potential medical expert discovery related to Ealy's eye injury. It does not appear that Ealy confused cases; he alleged an eye injury caused by the conditions at Lawrence from the start. In fact, if Ealy's liberty interest were central to the disposition of this case (and it is not), recruitment of counsel may have been necessary to help Ealy establish specific injuries stemming from the alleged atypical conditions. *See Pruitt*, 503 F.3d at 655–56 (While there are no "hard and fast rules" for evaluating the factual and legal difficulty of a plaintiff's claim, "[w]e have previously observed that some cases—those involving complex medical evidence, for example—are typically more difficult for pro se plaintiffs."). Because Ealy received all the process he was due, even accepting his alleged injuries as true, we need not address this point further.

Our task is not to determine whether we would have recruited counsel, but rather whether the district court abused

its discretion in denying Ealy's motions. We conclude that it did not.

### III.   Conclusion

For the reasons explained above, the judgment of the district court is AFFIRMED.