In the

# United States Court of Appeals

### For the Seventh Circuit

———————————

No. 22-2830

NORBERTO TORRES,

*Plaintiff-Appellant,*

*v.*

KENT BROOKMAN and JASON HART,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:19-cv-00248 — **Stephen P. McGlynn,** *Judge.*

———————————

ARGUED OCTOBER 28, 2024 — DECIDED OCTOBER 17, 2025

———————————

Before BRENNAN, *Chief Judge*, ROVNER, and KOLAR, *Circuit Judges*.

KOLAR, *Circuit Judge*. Prison officials at Menard Correction Center believed that Norberto Torres had engaged in gang-related activity by filling out a gang questionnaire. They gave him a disciplinary ticket and, after a hearing, sentenced him to three months in segregation. Torres argues that his due process rights were violated because the disciplinary hearing did not provide constitutionally required procedural

safeguards. Since our precedent requires only informal due process for prisoners who, like Torres, did not face the loss of good-time credits or other punishment that could lengthen their sentence, we affirm.

## I. Facts

Norberto Torres is a prisoner in the Illinois Department of Corrections (IDOC). In March 2017, while Torres was incarcerated at Menard Correctional Center, he was given two disciplinary tickets for being affiliated with a gang.

The first disciplinary ticket alleged that on March 9, 2017, correctional officers at the Pontiac Correctional Center had found a "Latin Folk questionnaire" in the belongings of a different prisoner transferring in from Menard. The Latin Folk Union is a gang, and according to the ticket, the gang requires members to fill out questionnaires identifying themselves, their offense, affiliation and other information. The ticket alleged that Torres had filled out the questionnaire, which is gang-related activity in violation of prison rules.

Menard officers served Torres the first ticket on March 13, 2017. Two days later, Torres went to an administrative hearing in front of defendants Hart and Brookman, who dismissed the ticket. Approximately one and half hours after the hearing and dismissal, the IDOC issued another ticket with nearly identical allegations. This time Torres was immediately taken to segregation. After two days in segregation, he was served with the second ticket. The second ticket had more information than the first, including allegations that officers had compared the questionnaire to handwriting samples from Torres's master file and determined they were a match. Additionally, the ticket alleged that Torres was a "self-admitted

member of the Maniac Latin Disciples," a group that falls under the Latin Folk umbrella of gangs.

Torres remained in segregation for a week until the hearing on the second ticket. The parties dispute whether Torres requested a witness for the hearings. Torres stated that he had requested a witness for the first hearing by sending the witness's information along with his statement to the adjustment committee through the institutional mail. Torres said he mentioned his request to Brookman and Hart during his second hearing. The ticket form has a detachable portion where an inmate can submit a request for a witness. That portion remains unfilled on both of the tickets.

At the hearing, no witnesses testified and IDOC presented no evidence aside from the ticket itself. Torres was not, despite his request, shown the paperwork that IDOC staff relied upon to find that he had completed the Latin Folk questionnaire. Torres pleaded not guilty to the second ticket and stated that he had not filled out the questionnaire. Torres pointed out that the ticket did not make sense because it was exactly the same as the prior ticket, which had been expunged. At the end of the hearing, Hart and Brookman recommended a guilty finding and a series of punishments, including three months in segregation. Menard's warden approved the recommendation.

Torres filed a grievance about the second ticket and subsequent hearing. He argued that the IDOC did not follow its own rules when it deprived him of a) an investigator to investigate the charge, b) the opportunity to properly prepare for the hearing, c) witnesses, d) the opportunity to be heard, and e) the ability to see the questionnaire or handwriting samples. Torres also disputed that he was a member of the Latin Folk

Union. He noted that a prior ticket for affiliation with the Latin Folk Union was "expunged due to inaccurate/insufficient information." Torres also pointed to his response to another ticket for affiliation with the Latin Folk Union, which pled not guilty because he was affiliated with a different gang.

The grievance officer found that Torres was guilty of the infraction, but recommended that the ticket be expunged because the hearing was not in accordance with IDOC's regulations. The warden agreed with the recommendation and the ticket was expunged in mid-June 2017, after Torres had served three months in segregation.

Torres says that the conditions in segregation were "inhumane." His toilet "leak[ed] underneath with toilet backflush, there were signs of mold and mildew everywhere." He also did not receive a bed or his property for three to four days. In segregation Torres could only leave his cell one or twice a week and he did not have phone privileges. He testified at his deposition that "all the toilets and all that in segregation are polluted with insects, infected, mildew, rust" forcing him to "breath[e] in rust."

Torres also described the conditions in his complaint, including allegations he had shown the warden that "smelly water" would come out of the toilet when flushed and that "a small amount of feces" would come out of the bottom of the toilet when he or his cellmate had a bowel movement. He stated that neither he nor his cellmate were given cleaning supplies to remediate the mold. Torres attached to his complaint a letter that he had sent to the warden about the "leaking, smelly toilet."

Torres filed this suit *pro se* in early 2019. After the completion of discovery, defendants moved for summary judgment, which the district court granted. The district court held that even if Torres had raised an issue of fact about whether he was given witnesses as requested, he had not shown that the conditions in segregation constituted an "atypical and significant hardship," meaning he was not deprived of a liberty interest. Torres now appeals, arguing there are issues of material fact as to the conditions of his confinement that should defeat summary judgment.

## II. Discussion

We chart a different course than the district court. We assume, without deciding, that Torres suffered an atypical and significant hardship, establishing a liberty interest that triggered due process protections. But because *Adams v. Reagle*, a case we decided after the district court's ruling, held that prisoners in Torres's position are only entitled to informal, nonadversarial due process, we affirm the judgment for defendants.

Summary judgment is reviewed *de novo*, taking all reasonable factual inferences from the record in favor of the nonmovant. *Adams v. Reagle*, 91 F.4th 880, 887 (7th Cir. 2024), *cert. denied* No. 25-31, 2025 WL 2906509 (Oct. 14, 2025). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *Tackett v. Dauss*, 132 F.4th 1026, 1030 (7th Cir. 2025).

"Prisoners may [] claim the protections of the Due Process Clause. They may not be deprived of life, liberty, or property without due process of law." *Wolff v. McDonnell*, 418 U.S. 539,

556 (1974). "A procedural due process claim consists of two elements: (i) deprivation by state action of a protected interest in life, liberty, or property, and (ii) inadequate state process." *Reed v. Goertz*, 598 U.S. 230, 236 (2023); *Prude v. Meli*, 76 F.4th 648, 656 (7th Cir. 2023).

### A. Liberty Interest

"Prisoners held in lawful confinement have their liberty curtailed by definition," so something more is needed to constitute an additional deprivation of their liberty. *Wilkinson v. Austin*, 545 U.S. 209, 225 (2005). Prisoners generally have a cognizable liberty interest in earned credit-time and other benefits that decrease their sentence length, *see Love v. Vanihel*, 73 F.4th 439, 451 (7th Cir. 2023), so the threatened loss of good time credits triggers a cognizable liberty interest. *Id.* at 487; *Piggie v. Cotton*, 344 F.3d 674, 677 (7th Cir. 2003); *Scruggs v. Jordan*, 485 F.3d 934, 939 (7th Cir. 2007). A liberty interest predicated on the circumstances of a prisoner's confinement, however, requires more. To implicate a liberty interest protected by due process based on a change in the conditions of confinement a prisoner must show they suffered "atypical and significant hardship … in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 471, 484 (1995).

The standard for "atypical and significant hardship" is dependent on the combined duration and conditions of the confinement. *Hardaway v. Meyerhoff*, 734 F.3d 740, 743 (7th Cir. 2013) (citing *Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 697 (7th Cir. 2009)); *Lisle v. Welborn*, 933 F.3d 705, 720–21 (7th Cir. 2019). We do not generally consider the duration of confinement as related to the prisoner's overall sentence and decline to do so now. *See Felton v. Brown*, 129 F.4th 999, 1008 (7th Cir. 2025) (analyzing duration of segregated confinement without

reference to sentence); *Lisle*, 933 F.3d at 721 (same); *Hardaway*, 734 F.3d at 744–45 (same); *Marion*, 559 F.3d at 697–98 (same)*; but see Thomas v. Ramos*, 130 F.3d 754, 761 (7th Cir. 1997) (distinguishing cases where the court found a liberty interest by comparing the time in segregation to overall sentence length). The standard is a flexible one, with no one dispositive factor; rather, "we must take into consideration all of the circumstances of a prisoner's confinement in order to ascertain whether a liberty interest is implicated." *Marion*, 559 F.3d at 699.

In segregation, Torres alleges that in addition to mold, mildew, insects, and rust, his cell contained raw sewage for three months. Defendants say that Torres did not present any admissible evidence of feces in the cell at summary judgment because he did not mention it during his deposition nor did he submit an affidavit attesting to the existence of feces in his cell. Torres points to his response brief stating the toilet "leak[ed] underneath with backflush," and referred to a description of the leaking toilet in his complaint. We liberally construe filings from *pro se* litigants, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), but because our precedent forecloses Torres's due process claim on the second prong—whether he received sufficient process—we need not resolve whether Torres's submissions should have been considered at summary judgment.

**B. Process Due**

The constitutional requirements for Torres's hearing are derived from the balancing test between the prisoner's protected interest, the risk of an erroneous deprivation, the cost of additional safeguards, and the government's fiscal and administrative interests, first laid out in *Wolff v. McDonnell*, 418

U.S. 539 (1974). *Wolff* recognized that prisoners have lessened liberty interests and prison officials manage the safety and order of a large group of people, so the procedural requirements for the adjudication of disciplinary charges must be the product of "mutual accommodation between institutional needs and objectives and the provisions of the Constitution." *Wolff*, 418 U.S. at 555–56, 566; *see also Wilkinson*, 545 at 225–26; *Felton*, 129 F.4th at 1008.

*Wolff* involved disciplinary proceedings that resulted in the loss of good time credits, thereby lengthening plaintiffs' prison sentences. *Wolff* articulated the due process requirements as: (a) "advance written notice of the claimed violation" so that a prisoner can "marshal the facts in his defense and [] clarify what the charges are," (b) the ability to call witnesses and present documentary evidence "when [doing] so will not be unduly hazardous to institutional safety or correctional goals," (c) an impartial decisionmaker, and (d) "a written statement of the factfinders as to the evidence relied upon and the reasons for the disciplinary action taken." *Id.* at 563–66, 570–71; *see also Superintendent, Massachusetts Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 454 (1985); *Scruggs*, 485 F.3d at 939.

We have used *Wolff*'s test to review the procedural safeguards extended to an inmate facing the loss of property. *See Prude*, 76 F.4th at 656. Regardless of the possible punishment, the disciplinary decision must be "supported by some evidence in the record." *Hill*, 472 U.S. at 454. Finally, we have held that a prisoner has a right to see exculpatory evidence "unless such disclosure would unduly threaten constitutional concerns." *Piggie*, 344 F.3d at 678.

*Wolff*'s criteria are the product of a balance between the prisoner's interest and the institutional demands of running a prison, so when those inputs vary, the required criteria also change. *Hewitt v. Helms*, 459 U.S. 460, 472 (1983), *abrogated on different grounds by Sandin*, 515 U.S. at 482–84. Torres was ordered to segregation as a disciplinary sanction, so we consider what procedural safeguards are due to a prisoner put into disciplinary segregation.

In *Wilkinson v. Austin*, the Supreme Court held prisoners had a cognizable liberty interest in avoiding transfer to a supermax prison given the "atypical and significant hardship" posed by conditions at the prison. 545 U.S. at 223–24. The state prison system assigned inmates to the prison based on a security classification, derived from "numerous factors (*e.g.*, the nature of the underlying offense, criminal history, or gang affiliation) but [] subject to modification at any time during the inmate's prison term if, for instance, he engages in misconduct or is deemed a security risk." *Id.* at 215. Prisoners were classified at either entry to the department of corrections or "during the term of incarceration if an inmate engages in specified conduct, *e.g.*, leads a prison gang." *Id.* at 216.

*Wilkinson* held the constitutional due process requirements for prisoners being transferred to the supermax were "notice of the factual basis" for assignment to the prison and "allow[ing] the inmate a rebuttal opportunity" and "[to] submit objections prior to the final level of [classification] review." *Wilkinson*, 545 U.S. at 225–26. This "informal nonadversary procedure" was appropriate given "the State's interest [in] the safety of other inmates and prison personnel" and "the experience of prison administrators" in accomplishing those goals. *Id.* at 228–29. The Court distinguished the

interests at stake, and thus the level of procedural safeguards due, from a prisoner being punished [with revocation of good time credits] for "specific, serious misbehavior." *Id.* at 228.

We looked to *Wilkinson* in *Westefer v. Snyder*, 422 F.3d 570 (7th Cir. 2005) (*Westefer I*), when we addressed whether Illinois prisoners transferred to the Tamms Correctional Center, a supermax prison, could bring a due process claim. *Id.* We reversed dismissal of their claim and remanded for discovery and factfinding on whether the conditions at Tamms posed a "significant and atypical hardship" and if the transfer procedures met the *Wilkinson* standard. *Id.* at 589–90.

After remand, and a trial judgment in favor of the *Westefer* plaintiffs, we vacated the district court's injunctive relief requiring certain procedural safeguards. *Westefer v. Neal*, 682 F.3d 679, 681–82 (7th Cir. 2012) (*Westefer II*). We held that *Wilkinson* only required "informal, nonadversarial due process" for transfer to a supermax prison and that the ordered procedures went beyond that standard. *Id.* at 684.[1] The transfer procedures in *Westefer II* were used both for inmates who were in disciplinary segregation, "whose record of prison discipline marks them as dangerous even in the disciplinary-segregation system in the State's other prisons," and those in administrative detention, "classified as too dangerous to be housed in the general population." *Id.* at 682.

Most recently, in *Adams v. Reagle*, we held that "an inmate who is facing transfer to disciplinary segregation is entitled only to 'informal, nonadversarial due process,' which

---

[1] We also held the district court's injunction violated the Prison Litigation Reform Act's mandate to order only the narrowest and least intrusive injunctive relief in the prison context. *Westefer II*, 682 F.3d at 684.

'leave[s] substantial discretion and flexibility in the hands of the prison administrators.'" 91 F.4th at 895 (quoting *Westefer II*, 682 F.3d at 684–85). Adams was charged with assault and unlawful possession of a cell phone while incarcerated, each conviction resulting in sanctions that placed him in disciplinary segregation and loss of good time credits; he was also reclassified into department-wide restrictive housing because he had committed eight conduct violations within one-year. *Id*. at 883. Adams successfully challenged his assault and cell-phone convictions, both through the prison hierarchy and through multiple habeas petitions, and his good time credits were reinstated. *Id*. at 884–85. By the time Adams received relief from these convictions, however, he had served two years in "restrictive housing," both due to the assault and cell phone charges and at least in part because of the reclassification decision. *Id.*

We held that because Adams's good time credits had been restored by the habeas case, "the only issue … is whether he should have received more process for his transfer to a more restrictive prison setting." *Id.* at 896. Relying on *Westefer*, we concluded that "an inmate who is facing transfer to disciplinary segregation is entitled only to 'informal, nonadversarial due process[.]'" *Id.* at 895. The requirements of informal due process are met when "an inmate is provided (1) 'notice of the reasons for the inmate's placement' in segregation and (2) 'an opportunity to present his views,' for instance in a written statement or at a hearing." *Id.* The decisionmaker must also remain impartial. *Id.* at 896.

Torres was served the second ticket approximately a week before the hearing. The second ticket stated the allegations against Torres and the evidence in support of the allegations.

Torres had an opportunity to present a verbal response to the charges at the hearing. He testified that he told Brookman and Hart that the second ticket did not make sense because it was exactly the same as the first, and that he had not filled out the questionnaire. Torres does not contest Hart or Brookman's impartiality. Thus, Torres received notice, an opportunity to be heard, and an impartial decisionmaker, the procedural safeguards due to him under *Adams*.

Torres suggests that despite holding prisoners have no due process right to call witnesses when facing disciplinary segregation, *Adams* left in place the "widespread rule" that prison officials "may not exclude witnesses requested by an offender with no explanation at all." Reply at 13 (quoting *Adams*, 91 F.4th at 889 (Rovner, J., dissenting) (internal quotations omitted). But every case that Torres cites applies this rule where good time credits are at stake and more than "informal, nonadversarial" due process is required. *See Piggie*, 342 F.3d at 661. ("Because [plaintiff] lost good-time credits…the proceedings before the disciplinary board had to comply with minimal standards of due process."); *Whitlock v. Johnson*, 153 F.3d 380, 385 (7th Cir. 1998) ("Due process requires that an inmate faced with the possible revocation of good-time credits be afforded the right to call witnesses in his defense."); *Ponte v. Real*, 471 U.S. 491, 496 (1985) ("[Plaintiff] possessed a 'liberty' interest, by reason of …'good time' credits, an interest which could not be taken from him in a prison disciplinary hearing without the minimal safeguards afforded by the Due Process Clause."); *Forbes v. Trigg*, 976 F.2d 308, 315 (7th Cir. 1992) ("In this case the parties do not contest that Forbes was deprived of a protected liberty interest—'good' or 'credit' time."). *Adams* held that such process is not required where only disciplinary segregation is at stake.

*Adams*, F.4th. at 895–96. Torres lacks support for his theory that due process requires an official to provide an explanation when excluding witness testimony *regardless* of the liberty interest at stake.

The dissent argues that we read *Adams* too broadly and improperly conflate lines of cases dealing with administrative segregation and disciplinary proceedings. *Post* at 15. We acknowledge that the purpose of administrative segregation and disciplinary sanctions can have different aims, and it is of course true that disciplinary matters focus more upon a prisoner's wrongdoing while incarcerated. Nevertheless, we opted for a bright-line rule in *Adams* that "an inmate who is facing transfer to disciplinary segregation is entitled only to 'informal, nonadversarial due process,' which 'leave[s] substantial discretion and flexibility in the hands of the prison administrators.'" 91 F.4th at 895 (quoting *Westefer II*, 682 F.3d at 684–85).

We end by noting that the Constitutional standards provide the floor, not the ceiling, of what process is due a prisoner deprived of a liberty interest. Torres's ticket was expunged due to violations of the state's administrative hearing procedures. Those procedures can be more stringent than those required under the Constitution, especially when prison officials may not know, ex-ante, the punishment that will be meted out.

### III. Conclusion

For the reasons stated above, the judgment of the district court is AFFIRMED.

ROVNER, *Circuit Judge*. dissenting. I believe this court is losing its way on prisoner due process claims. Today the court engrafts a lenient, informal due process standard onto disciplinary findings, which historically have required and should require a more robust set of procedural protections, including the right to call witnesses.

There is much to be commended in the majority's opinion. In particular, the court wisely rejects the notion that an inmate's liberty interest in avoiding disciplinary segregation should be measured against the overall length of his prison term. The court also assumes, rightly in my view, that Torres's three-month stint in a filthy and unsanitary cell in disciplinary segregation (replete with mold, mildew, rust, insects, and a toilet that discharged feces onto the floor when it was flushed) was sufficient to give rise to a liberty interest.

But in assessing whether Torres was accorded the process he was due, the court clouds matters by importing the standard for prison transfer and placement decisions into the disciplinary segregation context, with the result that unless a prisoner accused of wrongdoing loses good time credits, due process entitles him to no more than notice and the opportunity to respond—with no right to call witnesses (or have an investigator speak to them), no right to present documentary evidence, no right of access to exculpatory evidence, no right to a written rationale for the disciplinary decision, no right even to an explanation for the hearing board's refusal to grant his evidentiary requests. With the inmate's procedural rights so limited, few if any inmates punished with disciplinary segregation will be able to obtain relief under the Fourteenth Amendment's due process clause, however atypical and harsh the conditions they are forced to endure. This is

contrary to the Supreme Court's decisions in both *Wolff v. McDonnell*, 418 U.S. 539 (1974), and *Sandin v. Conner*, 515 U.S. 472 (1995), as well as multiple precedents from this court.

◆

Today's holding conflates two lines of case law that address distinct sets of interests and specify different levels of due process reflecting those interests.[1] One line, beginning with *Wilkinson v. Austin*, 545 U.S. 209 (2005), deals with a state's non-punitive, administrative decision to place an inmate in segregation (be it in-house segregation or a separate supermax facility) based on an inmate's overall criminal and prison history. In that setting, as discussed more fully below, the state's interests in security and the efficient management of its penal system are paramount, and the inmate's interest is, by comparison, more modest, given that he has already lost his freedom and can expect a certain degree of hardship. An informal process providing him with notice of the proposed placement and the opportunity to rebut the basis for it suffice to protect that interest.

The second line begins with *Wolff*, and it deals with a decision to punish an inmate for specified misconduct committed while in prison. Punishment can take the form of revoking an inmate's good-time credits, but it can also take the form of

---

[1] Both sets of cases naturally begin with the same question: Has the prison's action impinged on the inmate's liberty interest? Thus, it is not at all unusual to see precedents from both lines of cases cited as authority bearing on that threshold question. *See, e.g.*, *Jackson v. Anastasio*, 150 F.4th 851, 859 (7th Cir. 2025) (citing both the *Wolff* and *Wilkinson* lines of cases as to whether and under what circumstances an inmate's assignment to segregation can implicate a liberty interest sufficient to trigger due process protections).

disciplinary segregation. Either way, the punishment is based on a factual determination that the inmate has committed a particular wrongful act. In that punitive setting, the prisoner has a more compelling interest in the basis for the state's action than he does in the administrative setting. Specifically, he has an interest in avoiding arbitrary punishment; and that interest entitles him to more procedural protections than mere notice and the opportunity to rebut the charge. Thus, when an inmate is assigned to segregation as a punishment for misconduct, it is *Wolff* and its progeny that govern, not *Wilkinson*.

*Wolff* holds that a prisoner facing discipline that infringes on a liberty interest—including the loss of good-time credits—is entitled to certain basic procedural protections, including, as the majority acknowledges, advance notice of the charge; the ability to call witnesses and present documentary evidence, to the extent consistent with the safety and correctional goals of the prison; a neutral decisionmaker; and a written explanation of what evidence the decisionmaker relied upon and the reasons for its decision to impose discipline. Subsequent decisions have expanded the scope of *Wolff*'s protections. For example, *Ponte v. Real*, 471 U.S. 491 (1985), holds that when a prisoner's request for witnesses at a disciplinary hearing is refused, the refusal must be explained—if not contemporaneously, then at some later point. Further, our decisions in *Campbell v. Henman*, 931 F.2d 1212, 1214–15 (7th Cir. 1991) (per curiam), and *Chavis v. Rowe*, 643 F.2d 1281, 1286 (7th Cir. 1981), *abrogated on other grounds by Shango v. Jurich*, 681 F.2d 1091, 1098 n.4 (7th Cir. 1982), *limited by Merritt v. Broglin*, 891 F.2d 169, 172 n.5 (7th Cir. 1989), hold that the inmate facing discipline has a right to the disclosure of exculpatory evidence in accord with *Brady v. Maryland*, 373 U.S. 83 (1963), and *United States v. Agurs*, 427 U.S. 97 (1976), *overruled*

*on other grounds by United States v. Bagley*, 473 U.S. 667 (1985), so long as the disclosure does not threaten institutional concerns. That may include the right to review (or at least have the hearing officers review) relevant videotape surveillance. *Piggie v. McBride*, 277 F.3d 922, 924–25 (7th Cir. 2002) (per curiam). *But see also Love v. Vanihel*, 73 F.4th 439, 451–52 (7th Cir. 2023) (noting that we have "[s]carcely ever" added to the *Wolff* protections and are unlikely to do so in the future).

Although the Court's analysis in *Wolff* was focused on the loss of good-time credits, the Court suggested in dicta that the due process protections it specified logically ought not be limited to punishments that affect the length of a prisoner's sentence, but should apply also to a disciplinary assignment to solitary confinement:

> The latter represents a major change in the conditions of confinement and is normally imposed only when it is claimed and proved that there has been a major act of misconduct. Here, as in the case of good time, there should be minimum procedural safeguards as a hedge against arbitrary determination of the factual predicate for the imposition of the sanction.

418 U.S. at 571 n.19.[2]

*Sandin*, 515 U.S. 472, in turn qualifies the foregoing dicta in *Wolff*, holding that ordering an inmate to serve time in

---

[2] My understanding of the record is that Torres was not assigned to solitary confinement: he refers to having a cellmate in disciplinary segregation. But as the cases reveal, disciplinary segregation can involve a variety of atypical and significant hardships, of which social isolation is but one.

disciplinary segregation for an infraction does not implicate a liberty interest *unless* it subjects a prisoner to "atypical and significant hardship … in relation to the ordinary incidents of prison life." 515 U.S. at 484. In *Sandin*, a prisoner had been ordered to serve 30 days in disciplinary segregation after a prison adjustment committee found that he had physically and verbally interfered with a correctional officer who performed a strip search on him. Sandin argued that he was wrongfully denied the opportunity to present witness testimony at his disciplinary hearing in violation of *Wolff*, but the Supreme Court disagreed, reasoning that 30 days in disciplinary segregation "did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest" sufficient to trigger the *Wolff* protections. *Id.* at 486. The Court noted, *inter alia*, that although the disciplinary segregation to which Sandin was subject involved substantial restrictions on the time spent out of his cell, prisoners in the general population of the prison, which was a maximum-security facility, also experienced comparable restrictions, as there were regular lockdowns during the time that Sandin was in segregation. *Id.* In sum, because Sandin spent a relatively brief period of time in disciplinary segregation and the loss of privileges during that time did not result in such a significant and atypical hardship as to give rise to a liberty interest, Sandin did not have a due process right to present witnesses at his disciplinary hearing. *Id.* at 487.

So, although the loss of privileges that accompanies disciplinary segregation, especially for a short period of time, typically will not be enough to implicate a liberty interest triggering the *Wolff* protections, atypically harsh conditions in segregation—including extreme isolation, lack of heat or cooling, no bedding, infestation by insects or vermin, or otherwise

disgusting and unsanitary conditions—might suffice. We must therefore consider "the combined import of the duration of confinement *and* the conditions endured" *Marion Corr. Inst. v. Columbia*, 559 F.3d 693, 697 (7th Cir. 2009) (emphasis in original), to determine whether the assignment to disciplinary segregation implicates a liberty interest. Neither consideration will necessarily be dispositive by itself. *See Hardaway v. Meyerhoff*, 734 F.3d 740, 743 (7th Cir. 2013).

Torres's case thus presents a relatively uncomplicated and familiar question: Were the three months he spent in disciplinary segregation in filthy and unsanitary conditions as punishment for his infraction enough to show that he had a liberty interest in the outcome of the hearing that deemed him guilty of the infraction and that he was denied due process when the hearing officers, without any explanation, deprived him of the right to call witnesses?

Rather than engage with that question, however, the court instead applies *Wilkinson*, 545 U.S. 209, and *Westefer v. Neal*, 682 F.3d 679 (7th Cir. 2012), to conclude that because the discipline imposed on Torres did not include the loss of good-time credits, he was only entitled to informal, non-adversarial procedures at his disciplinary hearing, including advance notice of the charges and an opportunity to respond, with no right to call witnesses or to present other evidence.

*Wilkinson*, however, like our follow-on decision in *Westefer*, both had to do with prison transfer-placement decisions rather than the imposition of disciplinary punishment. *Wilkinson* agreed that the assignment of an inmate for an

indefinite term to a state's supermax facility,[3] which involved extreme isolation of the inmate among other hardships, did implicate a liberty interest; but the Court reasoned that the interest is one requiring only informal, non-adversarial process, including advance notice summarizing the basis for the inmate's assignment to the supermax facility coupled with a right on the part of the inmate to rebut the basis for the assignment.[4]

Such placement decisions are informed by the nature of an inmate's prior criminal history and/or his conduct within prison, *see Wilkinson*, 545 U.S. at 216; *see also Westefer v. Snyder*,

---

[3] The placement could be made at entry to the prison system based on the inmate's criminal history, including the commission of certain offenses like organized crime, or during incarceration based on certain specified conduct. Regarding the latter, the state's modified procedure for reclassifying an existing inmate to a maximum security level and placement into the supermax facility employed a score sheet which took into account the inmate's "age, the severity of the offense triggering the initiation of reclassification hearings, prior prison experience, prior violent behavior, pre-prison gang activity and escape attempts[.]" The prison official making the reclassification decision could also override an inmate's score based on any of the grounds identified for assignment of an inmate to a maximum-security level, which included "assaultive and/or predatory behavior; the nature of the inmate's conviction; leadership roles in riots or disturbances; the possession of contraband; the identification of the inmate as a leader of a 'security threat group' (prison gang); escape attempts; 'an ability to compromise the integrity of [prison] staff'; knowing exposure of others to HIV or hepatitis; or a chronic inability to adjust to a lower security level." *Austin v. Wilkinson*, 372 F.3d 346, 351 (6th Cir. 2004), *aff'd in part, rev'd in part, & remanded*, *Wilkinson*, 545 U.S. 209.

[4] In *Wilkinson*, the state provided the inmate with an opportunity to rebut the basis for placement in the supermax facility at two points in the multi-step decisionmaking process, and again 30 days after the placement took effect. 545 U.S. at 216–17, 226.

422 F.3d 570, 573 (7th Cir 2005), and are made in furtherance of the safety interests of both prison staff and other inmates. Applying the three-factor framework established by *Mathews v. Eldridge*, 424 U.S. 319 (1976), *Wilkinson* noted that: (1) the private interest of the inmate implicated by the state's placement decision, although more than minimal, is nonetheless a limited one, in that the inmate's liberty has by definition already been substantially curtailed; (2) the risk that the inmate might erroneously be deprived of this limited interest by being mistaken for another prisoner or by being singled out for insufficient reasons is adequately addressed by giving the inmate notice of the prospective placement and the opportunity to respond and point out any errors in the state's factual basis for the assignment; and (3) the state's interests in effectively managing a large prison system with scarce resources and ensuring the safety of guards and other prison personnel, the public, and prisoners themselves are not only strong but "dominant," and those interests could be undermined by allowing adversarial hearings with a right to call witnesses. 545 U.S. at 224–28.

*Wilkinson* concluded that on balance, the supermax placement decision is less like the decision to return a released inmate to prison for a parole violation, *see Morrissey v. Brewer*, 408 U.S. 471, 481–82 (1972), or to deprive an inmate of good-time credits for specific misbehavior, *see Wolff*, 418 U.S. at 555–57, both of which directly affect the time spent in prison and therefore warrant a more formal, adversarial hearing. Rather, it is more like the decision to place an inmate in administrative (i.e., non-disciplinary) segregation, *see Hewitt v. Helms*,

459 U.S. 460, 472–73 (1983),[5] or to preliminarily assess whether the inmate should be considered for parole, *see Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 16 (1979), decisions that "draw[ ] more on the experience of prison administrators" and/or are ones in which "the State's interest implicates the safety of other inmates and prison personnel," and in which the inmate's already-reduced liberty interest may be adequately served by an informal process. *Wilkinson*, 545 U.S. at 228–29; *see also Westefer*, 682 F.3d at 685 n.2 ("*Hewitt* and *Wilkinson* set forth the correct correctional standard for 'informal, non[-]adversary' review in the transfer-placement context.").

Prison disciplinary decisions, by contrast, involve fact-finding as to whether or not the inmate committed a particular, wrongful act. Unlike the sort of transfer-placement decisions at issue in *Wilkinson* and *Westefer*, disciplinary findings are not decisions based on a holistic assessment of the inmate's criminal history and prison conduct record, conducted in pursuit of prison management and security concerns, but rather constitute guilt assessments based on evidence (be it witness testimony, video surveillance, or documents) as to what the inmate did or did not do. *See Wolff*, 418 U.S. at 558

---

[5] As *Hewitt* explains, most prisoners can anticipate a placement in administrative segregation at some point during their incarceration, whether to await subsequent classification or transfer, for their own protection or to protect another inmate, to break up potentially disruptive groups of inmates or, as occurred in this case, pending the determination of whether the inmate engaged in misconduct. 459 U.S. at 468. Such managerial or precautionary placements in administrative segregation are to be distinguished from disciplinary assignments to segregation, which are predicated on a finding that the inmate engaged in misconduct. *See Higgs v. Carver*, 286 F.3d 437, 438 (7th Cir. 2002).

("Since prisoners in Nebraska can only lose good-time credits if they are guilty of serious misconduct, the determination of whether such conduct has occurred becomes critical[.]"); *Greenholtz*, 442 U.S. at 9–10 (noting the difference between a decision revoking parole, which involves "a wholly retrospective factual question," and a parole-release decision, which "depends on an amalgam of elements, some of which are factual but many of which are purely subjective appraisals by the [Parole] Board members based on their experience with the difficult and sensitive task of evaluating the advisability of parole release") (citation modified). The accused inmate, who faces the prospect of punishment tied to the particular conduct with which he is charged, has a concrete, cognizable interest in the accuracy of that decision. If he is found guilty, he will face not only "the stigma of wrongdoing or misconduct," *Hewitt*, 459 U.S. at 473, but possibly more time in prison due to the loss of good-time credits, as in *Wolff*, or a punitive assignment for an extended period of time to disciplinary segregation, where the conditions may be atypically and significantly more harsh than inmates normally endure, as envisioned by *Sandin*. Either way, the inmate has a liberty interest in not being arbitrarily punished for an offense that he did not commit. *Wolff*, 418 U.S. at 558, 571–72 & n.19. As *Wolff* recognized, that interest entitles him to relevant witness testimony, so long as that testimony is not inconsistent with prison security concerns. *Id.* at 566. At a minimum, he is entitled to an explanation as to why his request for witnesses was refused. *Real*, 471 U.S. 491.

Nothing in either *Sandin* or *Wilkinson* rules out the right to present witness testimony at a prison disciplinary hearing simply because the inmate has not been deprived of good-time credits. *Sandin* signals the opposite, as do our own cases,

which have repeatedly recognized that punitive assignments to disciplinary segregation involving atypically harsh conditions can give rise to a liberty interest triggering the *Wolff* requirements. *See*, *e.g.*, *Jackson v. Anastasio*, 150 F.4th 851, 861 (7th Cir. 2025) (in event jury concluded that inmate's three months in disciplinary segregation amounted to an atypical and significant hardship under *Sandin*, it would follow that inmate "was deprived of a liberty interest entitling him to the minimum procedures appropriate under the circumstances to ensure the protection of the individual against arbitrary action of the government," in violation of *Wolff*) (citation modified); *Ealy v. Watson*, 109 F.4th 958, 964–65, 967 (7th Cir. 2024) (declining to hold that five-month period in disciplinary segregation cells "that had poor plumbing and associated odors, were cold and dirty, and contained bugs and spider webs" was insufficient to implicate liberty interest, but ruling against prisoner on merits of his due process claim because record indicated, *inter alia*, that inmate was offered the opportunity to request witnesses at his disciplinary hearing but the record bore no evidence that he ever made such a request); *Williams v. Brown*, 849 F. App'x 154, 155, 157 (7th Cir. 2021) (non-precedential decision) (prisoner who was "deprived of bedding, exposed to relentless light that made sleep impossible, … and was subjected to an environment contaminated by feces and urine" during his eight months in disciplinary segregation had liberty interest sufficient to support his due process claim that he was wrongfully denied adequate notice of the charges against him and the opportunity to either present witnesses or have them interviewed by investigator); *Marion v. Columbia Corr. Inst.*, *supra*, 559 F.3d at 698 (inmate who alleged that he served 240 days in disciplinary segregation may have had liberty interest in avoiding that punishment,

depending on whether the conditions of that segregation were significantly more harsh "than those in the normal prison environment"; reversing district court's dismissal of prisoner's complaint and remanding for further proceedings), on remand, *Marion v. Columbia Corr. Inst.*, No. 07-C-243-C, 2009 WL 1181255, at *3 (W.D. Wis. May 1, 2009) (Crabb, J.) (concluding that allegations of complaint were sufficient to establish that defendants deprived inmate of due process under *Wolff* when they conducted disciplinary hearing in his absence and excluded two of the four witnesses he requested).

Relatedly, this circuit, like every other circuit to address the question, has concluded that when pretrial detainees—to whom *Sandin* does not apply—are punished for misconduct with an assignment to disciplinary segregation, due process requires that their disciplinary hearings have complied with *Wolff*.[6] *Rapier v. Harris*, 172 F.3d 999, 1005 (7th Cir. 1999) (pretrial detainee assigned to solitary confinement for 270 days as punishment for misconduct) ("as the circuits that have addressed the matter have indicated, although it is permissible to punish a pretrial detainee for misconduct while in pretrial custody, that punishment can be imposed only after affording the detainee some sort of procedural protection"); *id.* at 1004 (as to procedural protections required, citing, *inter alia*, *Mitchell v. Dupnik*, 75 F.3d 517, 524–25 (9th Cir. 1996) (pretrial detainees who are punished for misconduct are entitled to *Wolff* protections in their disciplinary proceedings, including a right to witnesses where consistent with safety concerns));

---

[6] Needless to say, because a pretrial detainee has not yet been convicted, let alone sentenced, any punishment for misconduct he commits during detention will not take the form of revoked good-time credits, as he has not yet earned any such credits.

*Johnson v. Murray*, No. 23-1805, 2024 WL 208152, at \*1–\*2 (7th Cir. Jan. 19, 2024) (non-precedential decision) (holding at screening stage pursuant to 28 U.S.C. § 1915A that pretrial detainee had likely interest in avoiding punitive 10-day assignment to disciplinary assignment, and "[w]hen discipline impinges on a detainee's recognized liberty interest, due process requires (among other things) timely notice and the right to call witnesses and present evidence"); *see also Williamson v. Stirling*, 912 F.3d 154, 176 (4th Cir. 2018) ("a jail official that seeks to discipline a pretrial detainee must provide the detainee with at least the procedural protections required by the *Wolff* decision"); *Jacoby v. Baldwin Cnty.*, 835 F.3d 1338, 1349 (11th Cir. 2016) ("[w]e hold that … [plaintiff pretrial detainee] was entitled to the due process protections enshrined in *Wolff* before being placed in disciplinary segregation"); *Stevenson v. Carroll*, 495 F.3d 62, 70–71 (3d Cir. 2007) ("the procedures required by *Wolff* apply if the restraint on liberty is imposed for disciplinary reasons; if the restraint is for 'administrative' purposes, the minimal procedures outlined in *Hewitt* are all that is required") (quoting *Benjamin v. Fraser*, 264 F.3d 175, 190 (2nd Cir. 2001)); *Surprenant v. Rivas*, 424 F.3d 5, 18 (1st Cir. 2005) (pretrial detainee assigned to disciplinary segregation as punishment for misconduct) ("*Wolff* has long established the level of due process required before a pretrial detainee can be deprived of a liberty interest in a disciplinary hearing."), *called into doubt in other respects by Fed. Ins. Co. v. HPSC, Inc.*, 480 F.3d 26, 32 (1st Cir. 2007); *Edwards v. Johnson*, 209 F.3d 772, 779 (5th Cir. 2000) (applying *Wolff* protections to Immigration and Naturalization Service's detainee awaiting deportation who was assigned to disciplinary segregation for misconduct).

To be sure, Torres is not a pretrial detainee; having been convicted of a crime and sentenced to prison, he must establish that the conditions of disciplinary segregation were atypically and significantly more harsh than those confronting prisoners in the general prison population in order to establish that he had a liberty interest in avoiding this form of punishment. But once he has made that showing, he is in a position equivalent to that of a pretrial detainee; both have a comparable liberty interest in avoiding erroneous assignment to disciplinary segregation as a punishment for misconduct. That interest is one that should warrant the *Wolff* protections, including the right to present witnesses. *See Lagerstrom v. Kingston*, 463 F.3d 621, 624 (7th Cir. 2006) ("Assuming for the sake of argument that [the inmate] had a protectible liberty interest [in avoiding punitive assignment to program segregation], the consequence that would follow is that he would be entitled to due process. In this context, due process requires that he receive advance written notice of the charges, the chance to present testimony and documentary evidence to an impartial decisionmaker, and a written explanation, supported by at least 'some evidence' in the record, for any disciplinary action taken.") (citing, *inter alia*, *Wolff*); *see also Prude v. Meli*, 76 F.4th 648, 657 n.4 (7th Cir. 2023) (*Wolff* protections apply to deprivations of property as well as liberty).

My colleagues reason that our opinion in *Adams v. Reagle*, 91 F.4th 880 (7th Cir. 2024), *cert. denied*, No. 25-31, 2025 WL 2906509 (U.S. Oct. 14, 2025), dictates a contrary holding, quoting its statement that "an inmate who is facing transfer to disciplinary segregation is entitled only to 'informal, non[-]adversarial due process,' which leave[s] substantial discretion and flexibility in the hands of the prison administrators." *Id.* at 895. But what the *Adams* majority characterized as "transfer

to disciplinary segregation" was actually a reference to an administrative decision to transfer the inmate to department-wide restrictive housing, which was the equivalent of placing him in a supermax facility. The facts of *Adams* are somewhat complex, but, simplifying matters a bit, the key points are these: Adams was charged in a prison disciplinary hearing with assaulting another prisoner. His request for a witness at his disciplinary hearing was denied without explanation. The hearing officer found him guilty of assault and battery, ordered the forfeiture of 360 days of good-time credits, reduced his credit-earning class, and ordered him to spend a year in disciplinary segregation. The finding that Adams had assaulted another prisoner in turn became part of the basis for a subsequent administrative decision to reclassify Adams to department-wide restrictive housing. Adams was ultimately able to reverse the revocation of his good-time credits by way of a habeas corpus petition: the judge agreed that the revocation of those credits entitled him to present witnesses pursuant to *Wolff* and that the unexplained refusal to grant him that opportunity deprived him of due process. (He was later recharged with and found guilty of the same offense, but he successfully appealed that finding within the prison hierarchy and had the sanctions expunged.) But Adams contended that the (later-restored) credits were not the only penalty he suffered as a result of the assault finding: he pointed out that by the time he prevailed in his challenge to the assault finding, he had already served two years in restrictive housing pursuant to the adverse reclassification decision. He contended that his time in restrictive housing, involving atypically harsh conditions, itself was an adverse consequence of the disciplinary proceeding at which he had been denied the right to call witnesses, thus entitling him to compensation for the denial of

due process. The *Adams* majority was not convinced: the decision to transfer him to restrictive housing, it reasoned, required only an informal, non-adversarial process, and not the right to call witnesses—as both *Wilkinson* and *Westefer* made clear. Notably, Adams, in his appeal to this court, never challenged the one year in disciplinary segregation that was part of the sanctions imposed for assault. As his briefs made clear, he was only challenging the two years he spent in restrictive housing as a result of the reclassification decision. *See* 91 F.4th 891–92 (dissent). The majority's application of *Wilkinson* and its holding that only informal process is required for such administrative placement-transfer decisions was thus unexceptional.

Reading *Adams* to hold that an inmate facing disciplinary segregation has only a limited right to notice and the opportunity to respond to a charge not only misapprehends what was at issue in *Adams* but effectively forecloses a due process right to witnesses no matter how long a period of time an inmate is ordered to serve in disciplinary segregation and how atypically harsh the conditions of segregation may be. I believe this is an error for multiple reasons.

First, construing *Wilkinson* to categorically rule out a right to witnesses in disciplinary segregation cases, as the majority understands *Adams* to do, would overrule a line of cases which recognize that the *Wolff* protections do apply when the length and/or conditions of disciplinary segregation are significantly and atypically harsh vis-à-vis the conditions faced by the general population of the prison. *See Jackson v. Anastasio* and the other cases cited above at pages 24–25. *Adams* did not purport to be departing from existing circuit precedent. Indeed, if that were the case, the court would have been

required to circulate its proposed opinion to the other active judges of this court before doing so. *See* Seventh Circuit Rule 40(e).

Second, limiting the full set of *Wolff* protections solely to inmates who have lost good-time credits will leave many inmates without an effective remedy for wrongful disciplinary findings. Recall that the point of the *Wolff* protections is to promote accuracy in prison disciplinary decisions and to avoid arbitrary punishments. 418 U.S. at 558. Revoking good-time credits is not the only means of punishing a misbehaving prisoner; requiring an inmate to serve time in disciplinary segregation under atypically harsh conditions may be a different form of punishment, but it is one that surely impinges on his liberty. An inmate facing the prospect of months (and perhaps years) in disciplinary segregation with little to no contact with other prisoners, little access to fresh air and exercise, few if any privileges, and possibly inhumane conditions surely has as much of an interest in the reliability of the decision finding him guilty of misconduct as an inmate who faces additional time in prison.

Consigning these claims to the Eighth Amendment is no answer. In theory, an inmate may be able to seek relief under the Eighth Amendment for the harsh conditions of confinement he has experienced in disciplinary segregation. *See, e.g.,* *Taylor v. Riojas*, 592 U.S. 7 (2020) (per curiam) (recognizing that assignment of inmate to a "shockingly unsanitary" pair of cells even for six days violates the Eighth Amendment); *but see also Jackson*, 150 F.4th at 870–71 (Hamilton, J., joined by Rovner, J., concurring) (noting that existing Eighth Amendment jurisprudence has not been particularly receptive to claims based on time spent in segregation, even when such

claims involved prolonged periods of solitary confinement). The Eighth Amendment may offer an inmate relief for the harsh conditions of his confinement, but not for a wrongful disciplinary finding resulting from inadequate procedures. And as the facts of *Adams* make plain, disciplinary determinations can have significant collateral consequences in subsequent prison transfer and placement decisions.

I take Judge Scudder's point in *Jackson* that our current, backward-looking approach to determining whether or not an inmate has a liberty interest in avoiding a punitive assignment to disciplinary segregation has its problems. In particular, using the conditions of disciplinary segregation as the retroactive trigger for the *Wolff* protections may have the effect of exposing hearing officers to liability for conditions that they did not foresee. *Jackson*, 150 F.4th at 880–81 (Scudder, J., concurring). But that backward approach is what *Sandin* and its focus on "the *actual* conditions of confinement," *see Marion v. Radtke*, 641 F.3d 874, 875 (7th Cir. 2011), necessarily require. And there are means (including jury instructions) to limit the liability of hearing officers to the procedural due process violations for which they are responsible. (A hearing officer who has knowingly foreclosed to an inmate the evidentiary means of challenging a disciplinary charge has committed a wrong that is distinct from the conditions that the convicted inmate subsequently ensures in segregation.) We might also consider making the liberty-interest assessment more forward looking by considering what penalties are possible when an inmate is charged with an infraction, as opposed to what penalties are ultimately imposed. If, for example, the charged infraction is one for which the hearing officers have the authority to revoke an inmate's good-time credits, it seems to me reasonable to argue that he ought to be entitled to the full panoply of

*Wolff* protections regardless of whether the officers ultimately select that particular penalty.

In any case, all that we need to say, and ought to say, in this case is that Torres has presented sufficient evidence from which a factfinder might conclude that his three months in disciplinary segregation—in a dank cell rife with mold, mildew, rust, insects, and a toilet that leaked feces onto the floor when flushed—exposed him to conditions sufficiently atypical and significant to establish a liberty interest in avoiding this form of punishment; that interest in turn triggered the *Wolff* protections, including a right (subject to security concerns) either to present witnesses or to have his witnesses interviewed by an investigator. Torres was denied that right, with no explanation.[7] The case should be returned to the district court for further proceedings.

I have, finally, considered whether the defendants are entitled to qualified immunity. In my view, they waived any

---

[7] As the majority points out, the record indicates that Torres did not fill out a witness request form for either of the two hearings (the first one that resulted in dismissal of the disciplinary ticket, and the second one that resulted in Torres's conviction). But Torres has averred that he requested a witness prior to the first hearing and at the second hearing, and given his personal knowledge on this point, his averment is sufficient to create a fact question, as the district court itself concluded. *See Roberts v. Neal*, 745 F.3d 232, 234 (7th Cir. 2014) (fact that plaintiff's averment that he filed grievance was uncorroborated by documentary proof did not permit court to discredit plaintiff on this point: "Roberts may have been lying about having filed a grievance—but alternatively the defendants may have been lying when they denied there was any record of such a grievance. A swearing contest requires an evidentiary hearing to resolve, and none was held."); *see also Wayland v. OSF Healthcare Sys.*, 94 F.4th 654, 657 (7th Cir. 2024); *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003).

such claim below by making what Torres appropriately characterizes as a "skeletal" argument for qualified immunity that did not adequately engage with the evidence he presented and did not cite a single case in support of the claim. Indeed, their argument contained a notation—"Look up cases in argument for case law to include here."—(R. 41 at 11)—which obviously envisioned further development of the claim that never took place. Legitimate qualified-immunity arguments must rest on the particular facts of the case and on the state of the law at the time the defendants acted. The defendants' argument below was deficient in both respects. *See Saucier v. Katz*, 533 U.S. 194, 201–02 (2001), *as modified by Pearson v. Callahan*, 555 U.S. 223, 236–43 (2009).

♦

I would therefore reverse the grant of summary judgment to the defendants and remand for further proceedings.

I respectfully dissent.